RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0376p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DAVID B. COX,

                *Plaintiff-Appellant,*

       *v.*

STANDARD INSURANCE COMPANY; BON
SECOURS - COTTAGE HEALTH SERVICES
GROUP PLAN,

                *Defendants-Appellees.*

No. 08-2033

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-13304—Anna Diggs Taylor, District Judge.

Submitted: October 8, 2009

Decided and Filed: October 29, 2009

Before: MARTIN, GUY, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Troy W. Haney, HANEY LAW OFFICE, P.C., Grand Rapids, Michigan, for
Appellant. Warren Sebastian von Schleicher, SMITH, von SCHLEICHER &
ASSOCIATES, Chicago, Illinois, for Appellees.

_____

**OPINION**

_____

     BOYCE F. MARTIN, JR., Circuit Judge. In this ERISA case, David B. Cox,
M.D., appeals the district court's judgment on the administrative record approving
Standard Insurance Company's discontinuation of Cox's long-term disability benefits.
We **AFFIRM** the district court's order.

1

**I.**

Cox worked as a family practice physician until April 2003, when he suffered a disabling event that he and his physician described as a stroke.[1]  Cox had a history of complex migraine headaches and suffered a migraine on April 23, 2003, that left him hospitalized.  Cox underwent various neurological scans and blood-flow tests in the following weeks.  His neurologist, Dr. Voci, evaluated Cox on June 5 and noted that the MRI scan showed "evidence for ischemic change in the brainstem and cerebellum."  Dr. Voci's progress notes over the next few years continued to describe Cox as suffering from "complicated migraine syndrome" that resulted in an "ischemic brainstem event." Dr. Voci further described Cox as having "suffered a stroke related to complicated migraine."

In June 2003, after Dr. Voci advised Cox that he should not return to work, Cox began receiving short-term disability benefits from Standard pursuant to a group plan through his employer, Bon Secours.  Standard's initial determination approving Cox for disability benefits was based on "limited notes" provided by Cox.[2]  The short-term disability benefits expired in October, at which point Cox began receiving benefits under Bon Secour's long-term disability plan which also was administered by Standard, because Standard determined that Cox met the "Own Occupation" definition for long-term disability.[3]  At Standard's request, Cox also applied and was approved for disability benefits through the Social Security Administration in June 2004.

During this time, Cox continued to receive follow-up care from Dr. Voci.  Dr. Voci's progress notes indicated that Cox suffered from "daily headaches," precipitated

---

[1]Cox was forty-two years old when the disabling event took place.

[2]Standard claims, and Cox does not refute, that it did not actually have a copy of Cox's MRI scans from his April 2003 event.  According to Standard, its physician adopted and did not question Dr. Voci's diagnosis of ischemia, *i.e.* a stroke.

[3]Under Standard's long-term disability plan, a claimant is disabled if he is unable to perform work in his own occupation.  A claimant can continue to receive long-term disability benefits under the "Own Occupation" definition for twenty-four months.  After twenty-four months, a claimant meets the "Any Occupation" definition of disability, under which a claimant is disabled,  only if he cannot perform any occupation which earns at least 60% of his pre-disability income.

by stress, weather, and bright lights. In a February 2004 letter, Dr. Voci stated that Cox had "persistent problems with balance and disequilibrium" and that he was at risk for "ongoing ischemic injury." In 2004, Cox went to the emergency room on several occasions for acute migraine events. Each time, he received pain medication and was discharged shortly thereafter.

Standard's "Own Occupation" long-term benefits lasted until October 2005. Cox, thereafter, received a letter from Standard in January 2005, informing him that he would have to meet the "Any Occupation" definition to continue receiving long-term benefits past October 2005. The letter also noted that Standard would be reviewing Cox's claim to determine if he met this definition. As part of this review process, Standard obtained additional medical records from Cox and had them reviewed by an outside neurologist.

Standard's outside neurologist, Dr. Elias Dickerman, concluded that Cox had a history of migraine headaches with transient neurological symptoms. Dr. Dickerman also noted that Dr. Voci, Cox's treating physician, had interpreted Cox's MRI scans differently than the reviewing radiologist, Peter Nefcy. He concluded that it would be "highly unusual" for Cox to have suffered a stroke, as Dr. Voci had diagnosed, given that the radiologist found no abnormalities in Cox's MRI scan. According to Dr. Dickerman, Cox received full neurological examinations during his 2004 emergency room visits and none of these exams were consistent with a previous stroke. Dr. Dickerman then concluded that the restrictions placed on Cox were excessive and not supported by the record.

After receiving Dr. Dickerman's analysis, Standard sent Cox for an independent medical evaulation with Dr. Robin Hanks, a neuropsychologist, on November 12, 22 and December 15 , 2005. In her report, Dr. Hanks noted that Cox complained of problems with balance, left-sided weakness, sleep disorder, difficulty focusing, panic attacks, memory difficulties, sensitivity to light, and word-finding difficulties, symptoms which generally can be described as "cognitive defects." Dr. Hanks performed fourteen separate tests on Cox to assess his complaints. Based on the test results, she concluded

that Cox did not suffer any cognitive decline secondary to a stroke. She also reported that Cox's memory, attention, and language skills, the cognitive symptoms of which Cox complained, were all within normal limits. Dr. Hanks concluded that there was no reason, from a cognitive standpoint, for Cox not to work.

As a final step in its review, Standard hired private investigators to survey Cox's activities over a three-day period in December 2005. The investigators observed Cox driving and shoveling snow during a snow storm. The investigators also observed Cox shopping at a local mall with florescent lights—which Cox claimed triggered migraines.

As a result of its review, Standard sent Cox an eight-page letter on March 23, 2006, notifying him that he no longer met the definition of "Any Occupation" disability under their plan and that his claim would be closed. The letter detailed Cox's medical history and reported complaints. It also informed Cox of the results of Dr. Dickerman's review of Cox's record, Dr. Hanks's tests, and the investigator's observations. The letter specifically noted that Dr. Dickerman had concluded that the exams performed on Cox during his 2004 hospitalizations did not show "deficit consistent with a previous stroke or ischemia." It further stated that Dr. Hanks's findings did not show "cognitive impairment secondary to [a] stroke in 2003."

In September 2006, Cox requested an administrative review of Standard's decision. As part of the request, Cox sent additional medical records and documentation to Standard. Standard sent these materials to a second neurologist, Dr. Lawrence S. Zivin, for review. Dr. Zivin noted that the small amount of possible ischemic changes on the MRI scans could not be interpreted as necessarily resulting from Cox's migraines or from a stroke, and he concluded that nothing in the medical records suggested that Cox could not perform his occupation as a family practice physician. In addition to Dr. Zivin's review, Standard also performed further investigation into Cox's activities. This investigation showed that Cox spoke at numerous medical conferences and worked as a consultant during his period of alleged disability.

On June 6, 2007, Standard sent Cox another letter informing him that it would uphold its decision to discontinue his benefits. Though the letter acknowledged that a

cerebral angiogram showed occlusion of the left vertebral artery (blood clotting in the artery) and that MRIs showed small amounts of mildly abnormal signal intensity in the brain potentially stemming from early ischemic changes, the letter went on to explain that Dr. Zivin had reviewed Cox's record and concluded that Cox did not have "any significant underlying anatomical vascular abnormality" and that the small amount of possible ischemic change could not necessarily be interpreted as being related to the migraines. In short, Standard determined that Cox's medical records as a whole did not provide sufficient evidence of neurological, physical or cognitive impairments to sustain a finding that Cox could not perform the material duties of his own occupation. The letter further suggested that MRI scans indicated that Cox had never actually suffered a stroke.

On August 8, 2007, Cox filed suit in the Eastern District of Michigan seeking a determination that he was entitled to restoration of his long-term benefits. The district court granted judgment on the administrative record in favor of Standard in a ruling from the bench.[4] Cox timely appealed.

## II.

We review an ERISA plan administrator's denial of benefits *de novo*, unless the plan gives the administrator discretionary authority to determine eligibility for benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When the plan gives the administrator discretionary authority, we apply the highly deferential arbitrary and capricious standard of review. *Id.* Under this deferential standard, when it is possible to offer a reasoned explanation, based on the evidence for a particular outcome, that outcome is not arbitrary or capricious. *Univ. Hosp. Of Cleveland v. Emerson Elec.*, 202 F.3d 839, 846 (6th Cir. 2000) (quoting *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989)). Deferential review is tempered, however, when an

---

[4]While the district court did not provide extensive reasons for its order, the hearing transcript indicates that the court found that the "record does support the position of Standard here" and that "all of the objective medical evidence . . . showed no evidence of a stroke." Thus, the district court appears to have reviewed the record in making its determination.

important conflict of interest consideration requires that benefits decisions be closely scrutinized. When the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises. In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits. *Metro. Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343, 2345 (2009); *De Lisle v. Sun Life Assur. Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009). Here, Cox concedes that Standard's plan contains language sufficient to grant discretion to Standard. Further, Standard both grants eligibility for benefits and pays benefits. Therefore, we review this case under the highly deferential arbitrary and capricious standard, while bearing in mind that a conflict of interest exists.

## III.

### A.   Post Hoc Justification for Termination and Review of the Record

Cox and Standard present inconsistent facts regarding the following: (1) whether Standard's decision to discontinue long-term disability benefits was based on a finding that Cox did not have a stroke, i.e. whether the no stroke justification was advanced post hoc; (2) whether the record indicates that Dr. Voci was the only physician who diagnosed Cox as suffering from a stroke; and (3) whether Standard incorrectly characterized Cox's disability as being a cognitive deficit when it discontinued his long-term benefits.

Cox claims that Standard did not use the "no stroke" justification to terminate his benefits until it reached the district court. He claims that, by advancing this new "post hoc" justification for denying his claim, Standard violated ERISA's requirement that a benefits administrator give specific reasons for its decision and provide a reasonable opportunity for a full and fair review. However, Cox's claim that Standard has changed the justification for its decision is simply not supported by the record.

Both letters sent to Cox informing him of the termination notified Cox that the decision was based, in part, on Standard's belief that Cox did not have a stroke. In its

March 23, 2006 letter to Cox, the first letter terminating his benefit, Standard informed Cox that the independent medical evaluation showed "no significant cognitive impairment secondary to stroke in 2003." The letter also stated that Standard's medical consultant had determined that Cox "never had a focal neurological deficit consistent with a previous area of stroke or ischemia."[5] In its June 6, 2007 letter to Cox's attorney informing Cox of the results of its administrative review, Standard justified its decision in part because no interpreting radiologists indicated any major abnormality and that the "small amount" of possible ischemic changes could not necessarily be interpreted as being connected to Cox's migraines. The letter also stated that Standard's consulting neurologist believed that Cox's MRI scans, taken after his April 2003 hospitalization, were not consistent with what would be expected of a patient who "had an actual stroke of the brainstem." The letter further stated that Cox's follow-up neurological exams, performed in 2004 when Cox sought treatment at the emergency room, were "inconsistent with residual impairment from a previous area of stroke or ischemia." Standard continued to advance the same justifications at the district court level. In its motion for judgment on the administrative record, Standard noted that its neurology experts "opined that Cox did not have a stroke on April 29, 2003 or at any time thereafter." Thus, Cox is incorrect in claiming that Standard has changed its justification for terminating his benefits.

Cox references these letters in his reply brief but characterizes Standard's justifications as "irrelevant snippet[s]." Cox is apparently arguing that, because Standard's letters do not contain the exact phrase "never had a stroke" and contained multiple reasons for the termination, its justification was later changed. This argument is not supported by case law.

We have previously held that the insurer did not comply with ERISA's full and fair review requirement because one letter justified termination on the grounds that "the materials requested [by the insurer] have not been received" but another letter justified

---

[5]Brain ischemia occurs when blood flow to the brain is interrupted, which results in cell death due to lack of oxygen. Four out of five strokes are caused by ischemia, or a lack of blood flow to the brain. Floyd E. Bloom, et. al., *The Dana Guide to Brain Health* 570 (2002).

termination on the grounds that the claimant "was not disabled." *Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 880 (6th Cir. 2007). Standard's interchanging of "stroke" and "ischemia" is not analogous to the situation in *Wenner*. In *Wenner,* we held that the insurer did not comply with ERISA's full and fair review requirement because the insurer's termination letters specified two completely unrelated reasons for terminating benefits. *Id.* In the present case, however, although the insurer uses the terms "stroke" and "ischemia" interchangeably in its termination letters, "ischemia" describes a type of stroke.[6] Therefore, the words "stroke" and "ischemia" are interrelated. Further, Cox's own treating physician uses the terms "stroke" and "ischemia" interchangeably. The record contains seventeen progress notes from Dr. Voci, ranging in date from June 2003 to February 2007, in which only two use the word "stroke" to describe Cox's condition. The remainder use descriptive terms such as "ischemia," "infarction," or "vascular event." Cox can hardly claim that he did not receive a "full and fair review" due to Standard's interchanging the terms "stroke" and "ischemia" when his treating physician does the same.[7]

The parties also disagree as to whether Cox has been diagnosed as suffering from a stroke by another physician aside from Dr. Voci. Cox claims that Dr. Voci's diagnosis is supported by a radiologist's report from his angiogram performed in May 2003, a claim, which if true, might buoy Cox's argument in this case. Cox claims that the report's statement that "[t]he left vertebral artery is not shown" is equivalent to Dr. Voci's diagnosis that Cox's left vertebral artery was "occluded" and that both statements are code for "had a stroke."[8] Cox quotes the 1728-page record without giving any specific citation as to where this report can be found. Leaving that aside, his lawyer attempts to clarify this argument by educating the Court on the technicalities of an

---

[6]Ischemic is a form of stroke. National Institute of Neurological Disorders and Stroke at the National Institute of Health, http://www.ninds.nih.gov/disorders/stroke/stroke.htm.

[7]We note that Cox is a medical doctor, so his claim of lack of notice rings even more hollow than it otherwise would.

[8]An occluded artery is one that is obstructed, blocked or closed off. Medline Plus Dictionary, provided by the U.S. National Library of Medicine and the National Institutes of Health, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=occluded.

angiogram. Cox's argument—claiming that one physician's assessment of an artery as "not shown" is the same as another's assessment that the artery is "occluded" and that both mean " stroke"—is not supported by anything aside from his attorney's bald assertion. Aside from Dr. Voci's progress notes and Cox's self reports, the record does not reflect that another physician independently confirmed that Cox suffered a stroke. The only other physician noting "an ischemic infarction of the brainstem" was Dr. Fancher—the initial physician at Standard to approve Cox's claim. However, this determination was made with "limited notes to review"[9] and, according to Standard, Dr. Fancher accepted Dr. Voci's determination that Cox had suffered an ischemic infarction at face value. Both of Standard's consultants who reviewed the full medical records stated that they did not believe that Cox's scans were consistent with those of a patient who had suffered a stroke. At best, it would be speculative for us to adopt Cox's logic as evidence that another physician supports Dr. Voci's diagnosis.

The third area of disagreement is over Standard's justification of "lack of cognitive deficit" for terminating the benefits. Cox claims that this reason ignores the true nature of his disability claim, which he states is premised on the risk of suffering another potentially deadly stroke. Cox is correct in stating that his disability claim was based, in part, on Dr. Voci's opinion that he was at risk of another stroke. However, he is incorrect in arguing that Standard fabricated the claim of lack of cognitive deficit. In a February 2005 letter to Standard, Cox himself claims that he was disabled because his migraine episodes caused slurred speech, disorientation, muscle weakness, and memory loss. Further, Dr. Voci wrote a letter in July 2003 to Standard claiming that Cox suffered memory loss, coordination problems, and "residual deficits from this initial ischemic event." Dr. Voci's progress notes, submitted by Cox to support his disability claim, also indicated that Cox had "word-finding difficulties." These are claims of present cognitive deficits, not of fear of future problems. As part of its review, Standard had Dr. Hanks perform an independent medical examination. Dr. Hanks ultimately concluded that Cox did not suffer cognitive deficit, but this conclusion was premised on

---

[9]*See supra*, note 2.

fourteen tests specifically addressing Cox's complaints—his memory, speech, word-finding ability, motor function, and energy. Thus, Cox is incorrect in arguing that Standard's justification is premised on something other than his stated reasons for being disabled.

Yet, even though Cox misstates the record, it does not automatically follow that we should uphold Standard's decision. We should still review Standard's decision to determine whether it was arbitrary and capricious, bearing in mind that Standard both grants and pays benefits. *Gismondi,* 408 F.3d at 298.

## B.   Decision to Discontinue Benefits

Under the arbitrary and capricious standard, an administrator's decision should be upheld if it was the "result of a deliberate, principled reasoning process and is supported by substantial evidence." *DeLisle*, 558 F.3d at 444 (quoting *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd,  Met. Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct. 2343 (2008)) . However, this review is not a rubber stamp. We must still evaluate the quality and quantity of the medical opinions on both sides. *Id* at 446. Further, while a plan administrator may not arbitrarily reject a treating physician's opinion, this opinion need not be given any special deference. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). When an entity both determines eligibility for benefits and pays the benefits, a conflict of interest exists, which the court should consider when reviewing the decision for an abuse of discretion. *Gismondi*, 408 F.3d at 298-99. Cox argues that a conflict of interest exists here, and Standard does not refute this claim. Thus, in reviewing Standard's decision, we   bear   in mind that Standard both determines eligibility of benefits and pays those benefits.

We have previously upheld a denial of benefits where independent consultants reviewed the medical records and determined that the claimant was not disabled within the meaning of the policy, although the claimant had been declared disabled by the Social Security Administration. *Whitaker v. Hartford Life & Acc. Ins. Co.*, 404 F.3d 947, 949-50 (6th Cir. 2005).   Similarly,  denial of benefits was not arbitrary and capricious when, although the treating physician believed the claimant was "totally

disabled," other medical evidence indicated that the claimant could perform sedentary work. *Smith v. Ameritech*, 129 F.3d 857, 864 (6th Cir. 1997).  However,  the Supreme Court found that the plan administrator's decision denying benefits was arbitrary and capricious because many factors weighed against the administrator's decision, including that:  a conflict of interest existed; the administrator failed to give any weight to the Social Security Administration's determination that the claimant was totally disabled; the administrator did not provide any explanation for rejecting the treating physician's opinion; and the independent medical consultant was not provided with all of the details on the claimant's disease. *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. at 2355.  Likewise, a denial of benefits was arbitrary and capricious where the record showed that:  the plan administrator did not account for the Social Security Administration's  total disability determination; the determination was made on a file review without an independent medical evaluation;  a conflict of interest existed; and the administrator ignored the objectively-verifiable evidence showing disability.  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295–97 (6th Cir.  2005).

In contrast to these precedents, we find that Standard's decision to terminate Cox's benefits was not arbitrary and capricious.[10]  In two separate letters to Cox, Standard advances the following reasons in support of its decision:  (1) the opinions of two consulting neurologists who did not believe that Cox suffered a stroke and who thought Dr. Voci's recommended  work  restrictions  were  not  justified; (2) the independent medical evaluation of a neuropsychologist who discounted most of Cox's stated symptoms based on the results of fourteen tests; (3) the three-day surveillance of Cox which showed him engaging in activities that he claimed triggered migraines; (4) the evidence showing that Cox worked as a consultant and spoke at conferences during his period of disability; (5) the evidence that Cox infrequently sought emergency care for his condition and was always promptly discharged after reporting to the emergency room; (6) the fact that Cox did not receive ongoing rehabilitation for his

---

[10]To the extent that the record indicates that Cox cannot work as a family practice physician, the "Own Occupation" definition, this evidence does not speak to Cox's eligibility under the "Any Occupation" definition.

reported complaints; (7) the evidence showing that at times Cox went weeks without headaches; and (8) the lack of physical evaluation by Dr. Voci to corroborate Cox's reported symptoms. Taken as a whole, this evidence shows that Standard's decision was the result of a "principled and deliberative reasoning process." *Glenn v. Metlife*, 461 F.3d, 660, 674 (6th Cir. 2006).

The only factors listed in *Glenn* and *Calvert* that would weigh in favor of finding that Standard's decision was arbitrary and capricious are that Standard did not take the Social Security Administration's disability determination into account and that a conflict of interest exists. While it is true that the Social Security Administration determined that Cox was disabled, he does not argue that Standard should have accounted for this in its own determination. Both the *Glenn* and *Calvert* courts noted that administrators are not bound by the Social Security Administration's determination. *Glenn v. Metlife,* 461 F.3d at 667; *Calvert,* 409 F.3d at 294. Moreover, we do not have any information on the Social Security Administration's determination of Cox's disability. Furthermore, this determination was made in 2004, two years before Standard's review of Cox's claim. Thus, the only factor weighing in favor of finding Standard's decision arbitrary and capricious is the conflict of interest. Without evidence of some abuse of discretion on Standard's part, this factor is not enough.

Cox additionally argues that Standard's decision was arbitrary and capricious because it did not address the preventative nature of his claimed disability. He cites Dr. Voci's statement that Cox continues to be at risk for "potentially disastrous" strokes to support his argument that his disability claim was premised on the risk of future strokes. He also contends that Standard "never 'got'" the true nature of his claim and instead treated his claim as being based on a supposed "cognitive deficit." Cox cites *Hoover v. Provident Ins.* to support his position that Standard incorrectly dismissed the preventative nature of Cox's disability. *Hoover v. Provident Insurance Co.*, 290 F.3d 801, 808 (6th Cir. 2002). However, in *Hoover,* the plan did not give the administrator discretionary authority to determine eligibility, so we reviewed *de novo* Provident's

decision to deny benefits. *Id.* at 808. Thus, this analysis is not applicable to the highly deferential arbitrary and capricious standard used in this case.

Cox's claim is flawed for several additional reasons. First, Standard accounted for Dr. Voci's belief that Cox should not return to work due to the risk of recurrent migraines in its June 2007 letter when it specifically rejected Dr. Voci's opinion because of a lack of clinical evidence substantiating Dr. Voci's opinion. Second, to the extent that Cox claims that Dr. Voci warned of "disastrous consequences" if Cox returned to work, this claim was an overstatement of Dr. Voci's opinion. Dr. Voci's "potentially disastrous consequences" statement appeared in his first letter to Standard in July 2003. However, in his February 2007 progress notes, Dr. Voci states that he does "not believe that [Cox] is capable of working." Thus, Dr. Voci's assessment of Cox's ability to work does not seem to match Cox's characterization of it. Third, Cox incorrectly argues that the "true basis" of his disability claim rested on the danger of future strokes; however, his own evidence gave other reasons for the disability claim. In a six-page physician statement submitted by Dr. Voci to Standard, Dr. Voci supports Cox's claim in part with Cox's "fatigue, severe and frequent migraine headaches, left-sided weakness, panic attacks, anxiety and depression," which Dr. Voci claims would be a "permanent issue." In addition, in February 2005, Cox sent a letter to Standard on his own behalf to support his disability claim, and in the letter, he highlighted the "severity of [his] symptomatology" as a basis for his disability and did not mention the "potential disastrous consequences" of returning to work. Thus, taking the record as a whole and applying the highly deferential arbitrary and capricious standard, Standard's decision appears to have been based on a "principled and deliberative reasoning process." *Glenn v. Metlife*, 461 F.3d at 666.

## IV.

For the foregoing reasons, we **AFFIRM** the district court's order.