NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0746n.06

No. 11-3405

FILED

*Jul 11, 2012*

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DENNIS SHAPPIE,                                    )
                                                   )     ON APPEAL FROM THE UNITED
      *Plaintiff-Appellant*,                       )     STATES DISTRICT COURT FOR
                                                   )     THE NORTHERN DISTRICT OF
v.                                                 )     OHIO
                                                   )
MINSTER MACHINE COMPANY RESTATED                   )                    O P I N I O N
NON-BARGAINING EMPLOYEES' RETIREMENT               )
PLAN,                                              )
                                                   )
      *Defendant-Appellee*.                        )


BEFORE:      COLE and CLAY, Circuit Judges; and MATTICE, District Judge.[*]

MATTICE, District Judge. Plaintiff-Appellant Dennis Shappie appeals the district court's

determination on cross-motions for judgment on the administrative record that the Retirement

Committee ("the Committee"), the administrator of Defendant-Appellee Minster Machine Company

Restated Non-Bargaining Employees' Retirement Plan ("the Plan"), was not arbitrary and capricious

in interpreting the phrase "regular monthly rate of earnings as reported for Form W-2 purposes

divided by the applicable number of months in the calendar year" in the Plan to exclude the housing

allowance provided by Minster Machine Company ("Minster") to Shappie while working for it

overseas.

_____

[*] The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee, sitting
by designation.

Shappie argues that the language of the Plan unambiguously provides that the housing allowance should be included when calculating his monthly earnings in determining his retirement income, making the Committee's decision not to do so arbitrary and capricious. Shappie also argues that, even if the Court finds the language to be ambiguous, the Committee's decision was still arbitrary and capricious given the Committee's substantial conflict of interest; its use of financial calculations – of the cost of the competing definitions to the self-funding employer – instead of the language and intent of the Plan in making its decision; and the indistinguishability of certain included items – such as the commodities and services allowance – from the excluded housing allowance. The Plan responds that the Committee's decision was "rational, well-reasoned and consistent with Plan language and prior practices," not arbitrary and capricious, and thus this Court is "require[d]" to uphold that decision and affirm the district court.

For the following reasons, we AFFIRM the judgment of the district court.

I.

The relevant facts are not in dispute. Shappie was hired by Minster on February 19, 1973, and continued in its employ until he retired on May 31, 2009, at the age of 57. From October 1995 through November 2004, he worked on foreign assignment for Minster in Hong Kong.

In July 1995, Minster enacted the "Expatriate Policy," a policy applicable to all employees working outside their home country for at least twelve months. The policy is divided into six sections: 1.0 Scope, 2.0 Employment Conditions, 3.0 Compensation, 4.0 Benefits, 5.0 Taxes, and 6.0 Termination.

Section 1.0 ("Scope") specifies that:

In consideration of the impact such assignment may have on employees and their families, it is the Company's intent, through this policy, to:

A.       Provide adequate incentives for employees and their families to move and to adjust to different living patterns and cultural and social environments.

B.       Provide reasonable assurance that no undue personal or financial hardships accrue to the employee as a result of a foreign assignment.

It further specifies that "[t]his policy covers only those items of overall·company practice which are different from those which routinely apply to all Minster employees."

The items included – and explained in detail – under the "Compensation" heading are: 3.1 Base Salary, 3.2 Salary Increase, 3.3 Housing and Utilities Allowance, 3.4 Commodities and Services Allowance, 3.5 Education Allowance, and 3.6 Method of Payment. The items included under "Benefits" are: 4.1 Coverage (relating to benefit program coverage), 4.2 Holidays, 4.3 Vacations, 4.4 Home Leave (providing for air fare to home country), 4.5 Emergency Leave, 4.6 Travel To and From Overseas Assignment, 4.7 Household and Personal Effects Transportation, 4.8 Automobile, and 4.9 Relocation Allowance. Section 5.0 "Taxes" has two provisions, one related to tax equalization payments and one related to tax preparation.

To arrange for the payment of his housing when he lived in Hong Kong, at first, Shappie would write letters to Bob Sudhoff, a Minster executive, specifying the amount of rent and to whom it should be paid, including bank account information. In 2002, Minster started paying the money for rent directly to Shappie.

The record also includes copies of documents entitled "The Minster Machine Company International Compensation Package" that are described as either "Prepared by Ernst Young, LLP"

or "Ernst and Young LLP," depending on the year, with effective dates of July 1, 1996, January 1, 1997, and January 1 and February 20, 1998. These appear to be summaries of compensation relating to Dennis Shappie, all of which list amounts – given in both "annual" and "weekly" amounts – for: (1) "Base Salary"; (2) "Hypothetical Tax Withholding Federal and State of Ohio"; (3) "Relocation Allowance"; (4) "Housing and Utilities Allowance"; (5) "Hypothetical Shelter Retention" (with a notation below "Reflects your home country rent or mortgage interest, utilities, property and household goods, insurance, maintenance and repair, and property tax"); (6) "Commodities and Services Allowance"; and (7) "NET PAY IN HOME CURRENCY." The 1997 summary adds "Qtrly. Adj. - Weekend & Holidays (27% x Base)" and "401K Contribution (13% x Base)." The 1998 summary keeps those two additions – although moving the "Qtrly Adj." to after the net pay line and excluding it from that value – and omits the "Relocation Allowance" amount. For each of these three summaries, the "Housing and Utilities Allowance" is listed as "Paid in Kind" with no fixed monetary value given (or included in the "net pay" values). There are no more of these summaries for any of the other years Shappie was in Hong Kong.

On August 7, 1997, Dave Stucke sent Shappie a memorandum with the subject line "Tax Issues" that addressed tax issues surrounding Shappie's living costs while he was "an Expatriate." It said that the "living costs" of his for which Minster was paying "are a taxable fringe benefit to you, and you must pay payroll taxes on this amount," while continuing to say "[t]he only taxes you must pay on this benefit are social security and medicare taxes." The memorandum said that the amount Minster paid for Shappie's housing (approximately $2900 a month) would be "added to" his weekly pay so that his "taxes [would be] calculated on [his] gross plus the benefit," with "the amount of the

adjustment [then being] deducted back out of [his] net pay." Stucke said "I know this is confusing . . . You just need to remember that you receive no additional cash compensation as a result of receiving the benefit; however, your net pay will be reduced by the amount of the taxes on the benefit." It concluded by saying that because the living expenses had not been recorded by payroll, his paychecks would reflect "catch up" payments through October 1997, after which he would be "current" and would see only the once-monthly adjustment. While not addressed by this memorandum, both the Plan and the district court identified another tax issue as significant: that while Shappie was living in Hong Kong, it appears as though he claimed not only the Housing Exclusion and/or Deduction, but also the Foreign Earned Income Exclusion on his federal tax returns.

Shappie became a participant in the Plan on June 20, 1977, the current version of which was last amended October 1, 1997. The Plan specifies that Shappie's "Monthly Retirement Income . . . shall be equal to . . . [o]ne and two tenths percent (1.2%) of [his] Average Monthly Earnings multiplied by [his] Credited Service," but "in no event less than . . . [s]ixteen dollars and fifty cents ($16.50) multiplied by the [his] Credited Service." "Average Monthly Earnings" is defined (in relevant part) in Section 1.07 as "the highest average of Monthly Earnings (as defined in this Article I) as determined for any sixty (60) consecutive months prior to the Participant's Disability Date, Early Retirement Date, Normal Retirement Date, termination 1 date under Section 4.01, or date of death." "Monthly Earnings" – the phrase subject to so much dispute in this action – is defined (in relevant part) in Section 1.31 as "the Participant's regular monthly rate of earnings as reported for

Form W-2 purposes divided by the applicable number of months in the calendar year." The provision goes on to specify "[s]uch rate shall be determined as of the first day of each month."

The Plan also specifies how it is to be administered in Article V ("The Retirement Committee"). Section 5.01 sets forth how the Committee is to be established: "The Board of Directors shall appoint three (3) or more persons to be known as the 'Retirement Committee' to administer the Plan and to keep records of individual Participant benefits." Those members "shall serve until their resignation or dismissal by the Board of Directors," and "[t]he Board of Directors may dismiss any member of the Retirement Committee at any time with or without cause." Claims Procedures are set forth in Section 5.03, which includes the provision "[t]he Retirement Committee shall interpret the Plan and shall determine all questions arising in the administration, interpretation and application of the Plan." It also directs the Committee to "rely on the records of the Employer, as certified to it, with respect to any and all factual matters dealing with the employment of an Employee or Participant," and specifies that if there is a factual dispute, the Committee "shall resolve such dispute giving due weight to all evidence available to it." During the dispute over Shappie's retirement benefits, the Committee had three members – Stephen Kill, Robert Sudhoff, and John Winch – who were, respectively, Minster's Vice-President for Human Resources, Chief Financial Officer, and President.

Shappie began considering retirement in 2008 and asked Kill to calculate his potential retirement benefits. Kill provided Shappie with a "Retirement Calculation Detail" on July 15, 2008, which (among other things) showed that the five years of compensation to be used for the average were 2000-2004 and had compensation in the amounts of $105,855.60, $103,570.72, $141,426.98,

$135,206.99, and $122,162.70 respectively. After briefly reviewing these figures, Shappie decided

to delay making a decision until 2009. In February 2009, he looked at the figures again and noticed

that the housing allowance was included in his compensation only for the years 2002-2004. He asked

Kill to revise the calculations such that the housing allowance was included for all the years he

worked in Hong Kong; Kill responded that the housing allowance should not have been included at

all. Kill provided a revised Retirement Calculation Detail on February 20, 2009, which showed the

highest five years to be 1998-2002, with compensation in the This updated calculation excluded not

only the housing allowance, but also the Commodities and Services Allowance ("C&S allowance")

and the foreign service bonus.

In a letter to Kill dated April 4, 2009, Shappie wrote that he "disagree[d] with [his]

calculation," going on to explain:

> My reason for the appeal is that, in computing my monthly retirement benefit, you did not take into account the full amount of my reported W-2 income in determining the highest consecutive 60 months of Monthly Earnings under section 1.31 of the Plan and Average Monthly Earnings under section 1.07 of the Plan.

> Since 1995 and the beginning of my ex-pat contract I have understood that the W-2 statements would be used to determine my retirement benefits the same that is stated in the Summary Plan Description. I have been provided with periodic statements since 2004 with calculations of retirement benefits that were based on the W-2 statements. I was told by Jim Maish that the retirement benefits were based on the W-2 statements and that the housing allowance was included in the calculation.

> As you recall in February 2009 I approached you for a review of the calculation since I saw that the years used in the calculation were not my best years and some did not show the correct W-2 earnings. At that time you reviewed my calculations and reduced the benefit by removing the housing allowance from the W-2 reported income. The reason offered was that it was the interpretation of the plan administrators that the housing allowance was to be excluded. I cannot find any

language in the Plan or Summary Plan Description to support this decision so I feel it necessary to request a review by the retirement Committee.

The record also includes an undated document prepared by an unidentified author labeled "Dennis Shappie Pension Eligible Earnings Worksheet" ("the Worksheet"). Given Shappie's letter, the language used in that document and its general content, and the course of the relevant events, it appears that the Worksheet was prepared around the time Shappie wrote his April 4, 2009 letter and before the Committee's May 4, 2009 decision. The worksheet gives dollar amounts for the following line items for the years 1996 through 2004, with what appear to be the author's added comments and descriptions, identified in the original with italics or parentheses: (1) "Base and 10% Foreign Assignemnt [*sic*] Amt"; (2) "Commodities & Services Allow"; (3) "Hypo Tax deduction"; (4) "Vacation Adjustment"; (5) "Hong Kong Housing" with a note below "*Housing was paid to his landlord with a non-cash tfb[1] adjustment done in payroll*"; and (6) "Family Travel" with the parenthetical "(non-cash TFB)."

Three other line items are also included, but have values for only one or two years: (1) "Travel Bonus Adjustment"; (2) "Insurance Bonus Adjustment" with the parenthetical "(Mercer didn't include, we did on the latest calcs and will this time too)"; and (3) "Tax Equalization 95 - 98" with both the parenthetical "(not going to include for calc, but was included on the latest calcs given to DS)" and a note below "*compares taxes would have been liable for if in Ohio against his tax liability per his returns*."

---

[1] Given the context provided by the Stucke letter, "tfb" can be read to stand for "taxable fringe benefit."

Following these values is a table – headed by the italicized comment "*1998 max comp was $160k - he hits the limit if we include housing*" – that appears to give estimates under four different scenarios, identified as: "Grand Total with 401k def included"; "Pension Eligible excluding C&S"; "Pension Eligible Cash Compensation including C&S" (which appears to be highlighted or selected); and "Pension Eligible if have to include Housing too." Below the table is a note saying "*note If we have to do this - these are even higher than what originally tipped him off to the problem, because those numbers backed out the hypo tax.*" There is also a summary table – prefaced with the note "*These are very rough estimates!!*" – showing the value for "Mthly Ave Used for calc given to Dennis" as 8669.29 and then showing results for "Increase to Mthly Average," "Approx effect to mthly pension amount," and "Over 20 years" under two different scenarios – "with C&S" and "with housing & C&S." As Shappie notes, the "Over 20 years" column shows a difference of almost $300,000 between "with C&S" ($98,580) and "with housing & C&S" ($395,146).

In keeping with the claims procedures outlined in Section 5.03 of the Plan, the Committee responded to Shappie's letter and provided a written notice related to the partial denial of Shappie's claim by its own letter dated May 4, 2009, noting (in relevant part):

> The Plan definition of Monthly Earnings provides that the earnings to be considered are the Participant's "regular monthly rate of earnings as reported for Form W-2 purposes." Thus, not only must the earnings be reported for W-2 purposes, but the payments at issue must be a regular rate of monthly earnings. On this basis, the following are included in your "Monthly Earnings" for purposes of calculating your benefits:
>
> • Base and 10% Foreign Assignment Bonus
> • Commodities and Services Allowances
> • Weekend and Holiday Pay
> • Vacation Adjustments

> • Travel Bonus Adjustments
> • Health Insurance Premium Adjustments

Excluded from your "Monthly Earnings" for purposes of calculating your benefits are the following:

> • Airline tickets purchased for your family
> • Lump sum tax equalization payments
> • Housing allowance

> The items excluded were not part of your regular rate of monthly earnings. You specifically questioned the exclusion of your housing allowance. As you know, the housing allowance was paid to your Hong Kong landlord, and the amount of the payment was based on the actual rent incurred. Although we were required to include these on your W-2 statement for tax purposes, these payments were not a part of your "regular rate of monthly earnings" and are properly excludable from your pension calculation.

Nowhere does the Committee give what it believes the definition of "regular rate of monthly earnings" to be, nor does it say why certain items were included or excluded, save the housing payment, although its statement "[y]ou specifically questioned the exclusion of your housing allowance" may reflect its belief that Shappie's letter questioned only the exclusion of the housing allowance, despite his letter's reference to the W-2 reported amount of income generally.[2] The letter concludes "[t]his is intended to serve as a partial denial of your claim for additional benefits" and sets forth the process for appealing from the Committee's determination.

Shappie timely appealed this decision, by letter from his counsel dated June 11, 2009. It set forth a number of grounds for his appeal, including: (1) that statements made by Ms. Barbara Smith – an Ernst & Young employee engaged by Minster to help develop the Expatriate Policy – induced

---

[2] The value of the tickets and the equalization payments are negligible as compared to the effect of the housing payment, which may explain the apparent confusion.

him to accept the foreign assignment based, in part, on the expectation of higher earnings in retirement; (2) the multiple, conflicting calculations of his retirement benefits he had received from Kill and the Committee; (3) the plain language of the Plan, with his argument emphasizing the phrase "as reported for Form W-2 purposes"; and (4) his arguments that the fact that the housing allowance was briefly paid to a third party not only should not have had any effect on the treatment of that money, but also that there was no language in the Plan justifying such differential treatment.

On August 7, 2009, the Committee issued its final decision upholding its May 4 determination. The Committee recounted the history of Shappie's employment and the instant dispute, before stating that:

> In reaching its conclusions, the Retirement Committee has reviewed Attorney Keister's letter, as well as historic actuarial calculations, the language and intent of the Plan, the intent of the expatriate arrangement with Mr. Shappie, the history surrounding Mr. Shappie's foreign assignment and the nature of the items which have been included and excluded from the definition of Monthly Earnings for purposes of the Plan.

The Committee then outlined the "Basis for Determination," addressing the points in Shappie's appeal in turn. As to Ms. Smith, it said that it could not find any evidence she made the statements Shappie alleged, but that even if she had, she was not a Minster employee, a member of the Retirement Committee, nor a fiduciary of the Plan, and thus could not make representations on the Plan's behalf.

As to Shappie's arguments regarding the language of the Plan, the Committee reframed his attorney's arguments somewhat, in a manner not entirely in keeping with the arguments actually made by Shappie's counsel, construing Attorney Keister to be arguing that it "should ignore the

portion of the definition of Monthly Earnings which references 'regular rate of monthly earnings' because that phrase is not defined in the Plan" and that "in order to exclude the housing allowance, the Plan must specifically provide for such an exclusion," which the Committee then took to mean Keister was arguing that "the only relevant language in the definition of Annual Earnings is the reference to the Form W-2." The Committee rejected these arguments in turn, citing its full discretion to interpret the Plan and noting that adopting such a construction of the language would ignore the phrase "regular monthly rate of earnings." The Committee went on to say that "[b]ased on the language of the Plan, the nature of the payments at issue and historic Plan administration, the Retirement Committee has determined that the Housing Allowance was not part of Mr. Shappie's regular monthly rate of earnings," which conclusion was unchanged by "[t]he fact that the Plan does not contain a specific exclusion for the Housing Allowance . . . ."

Third, the Committee addressed the inconsistencies in the various calculations given by discussing a change in actuarial consulting firms and the technical source of compensation figures they used.

Finally, the Committee discussed the Housing Allowance specifically, noting that "Shappie was aware that the Housing Allowance was not part of regular earnings," because he "was provided with a summary of his compensation package, dated July 1, 1996," which "showed the Housing Allowance as 'Paid in Kind' and not part of Mr. Shappie's pay." Next, it noted that "[t]he Housing Allowance payments were not made as part of Minster's regular payroll," and referenced the August 1997 Stucke Memorandum regarding tax issues. Third, it discussed the manner of payment of the housing allowance – first to United Asia, then to Shappie directly after United Asia closed – saying

only that "[a]lthough the payments were reported for W-2 purposes, they were not part of Mr. Shappie's regular earnings." Fourth, the Committee analyzed Shappie's W-2 statements, noting that "[t]he 1996 W-2 clearly shows that Housing Allowance and reimbursement for family travel were not considered regular earnings," because "[t]hese items were reported on a 'Supplemental W-2' and shown as 'Benefits' in Box 12," and because "[s]imilarly, the 1997, 1998, 1999 and 2000 W-2s also showed the housing allowance as a 'Benefit' in Box 12," until 2001, when "the government changed the Form W-2, and there was no longer a clear place to break out Benefits included in the wages box." Fifth, it stated that it believed that the purpose of the housing allowance was not "irrelevant," as it believed Keister had argued, because "[t]he payments were based on the actual rent incurred" and because "[u]nder no circumstances were the payments intended to be used by Mr. Shappie for any other purpose." Finally, it stated that "Shappie himself did not treat the housing allowance as part of his regular earnings," because he "reduced his taxable income on his U.S. income tax return each year by the maximum amount permitted which was attributable to his housing allowance. This amount was treated separately from his foreign earned income." The letter advised Shappie that if he did "not agree with this decision, he ha[d] a right to bring a civil action under Section 502(a) of [ERISA]."

Shappie did so, filing the instant suit in state court on November 3, 2009. The Plan removed the case to the Northern District of Ohio on November 30, 2009. After cross-motions for judgment on the administrative record, the district court ruled in the Plan's favor on March 22, 2011.

The district court found the phrase "regular monthly rate of earnings as reported for Form W-2 purposes" to be ambiguous. It rejected Shappie's argument – that "because the housing

allowance was 'paid at a regular monthly rate' by Minster, it was part of his 'regular monthly earnings.'" – on the grounds that (1) "the phrase 'regular' would be redundant with 'monthly' if it were interpreted to refer only to the intervals at which Plaintiff received compensation"; and (2) "while the housing allowance was 'regular' in the sense that it was paid on a regular monthly basis, it was not 'regular' in the sense that it was, by Plaintiff's own admission, a variable amount dependent entirely on the actual housing costs incurred by Plaintiff." The district court also emphasized that "it was the only item listed on Plaintiff's compensation package as 'Paid in Kind'" and reiterated the Committee's arguments about the W-2 breakout of housing costs. It then found that the Committee's August 2007 decision was a "'reasoned explanation' adequately supported by the record," repeating the five bases laid out in that decision (in-kind designation, based on actual rent, August 1997 memorandum, broken out on W-2, and Shappie's deducting it).

The district court then addressed Shappie's conflict of interest argument – premised upon the Committee's being comprised of three of the highest-level executives within the company that was also responsible for paying claims – although it seemed to focus almost exclusively on precedent emphasizing a history of biased claims administration. It said that Shappie "attempts to bolster his 'conflict-of-interest' argument with evidence that the Committee's interpretation creates unjustifiable inconsistencies between the treatment of his housing allowance and 'other employment revenue' he derived, such as his Commodities and Services Allowance," but rejected these arguments, finding that there was a reasonable basis for treating the C&S allowance differently from the housing allowance. Among these bases were that the C&S allowance "was analogous to a cost of living adjustment, which most employees receive annually as an increase in salary" and that it "did not vary

-14-

on a monthly basis; was not demarcated 'Paid in Kind' on the itemization of Plaintiff's compensation but instead given a specific dollar amount; was not tied to actual expenses incurred; and was not listed in Box 12 on Plaintiff's Form W-2."

Finally, Shappie appealed to this Court on April 22, 2011.

II.

Because the Plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," this Court reviews the district court's decision *de novo* but reviews the Committee's decision under the arbitrary and capricious standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As we have previously noted "[u]nder this deferential standard, when it is possible to offer a reasoned explanation, based on the evidence for a particular outcome, that outcome is not arbitrary or capricious." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). Further, "we grant plan administrators who are vested with discretion in determining eligibility for benefits great leeway in interpreting ambiguous terms." *Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995) (citing *Cook v. Pension Plan for Salaried Emps. of Cyclops Corp.*, 801 F.2d 865 (6th Cir. 1986)). Yet the arbitrary and capricious standard "is not a rubber stamp of the administrator's decision," but rather "requires us to review the quality and quantity of the evidence and the opinions on both sides of the issues." *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009) (internal citations, quotation marks, and alterations omitted).

The parties disagree, though, on how this standard of review is affected by any conflict of interest. In *Cox*, we explained the effect of any conflict of interest:

> Deferential review is tempered, however, when an important conflict of interest consideration requires that benefits decisions be closely scrutinized. When the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises. In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits.

*Cox*, 585 F.3d at 299 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)). While "such a conflict is a red flag that may trigger a somewhat more searching review of a plan administrator's decision, [ ] the arbitrary and capricious standard remains in place." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311-12 (6th Cir. 2010) (citing *Glenn*, 554 U.S. at 115).

We reject Shappie's contention that the language of the Plan is unambiguous. In doing so, it is important to note that, first and foremost, all relevant parties, including the district court, have been analyzing only part of the key phrase; the full sentence containing the disputed language reads: "regular monthly rate of earnings as reported for Form W-2 purposes *divided by the applicable number of months in the calendar year*." The term "rate" is nonsensical if the emphasized language is excluded, as the earnings reported on the W-2 are yearly sums, not a monthly rate. To achieve a monthly rate, it is necessary to divide that yearly sum by the number of months worked (usually – as in this case – twelve). From the full context, it appears to the Court that the only way to read that sentence is as the Plan setting forth an objective measure to determine the "monthly rate of earnings," that is as the W-2 wages, compensation, tips, etc. divided by the number of applicable months. The addition of "regular," though, introduces significant confusion and ambiguity, as – despite the Committee's contentions – the W-2 Form does not break income down into "regular" and other. Further, the Plan uses the word "regular" or one of its related form in other contexts, and the

meaning therein tends to support Shappie's "routinely recurring" construction. Regardless, because this Court agrees that "regular" introduces significant ambiguity into the phrase "regular monthly rate of earnings as reported for Form W-2 purposes divided by the applicable number of months in the calendar year," we thus must defer significantly to the Committee in interpreting the phrase.

The Court agrees with Shappie, however, that the Committee here evidenced significant bias in this case. Even factoring in this bias, this Court cannot say that the Committee's decision was arbitrary and capricious. While – despite the Plan's contentions – the W-2 Form does not break income down into "regular" and other, it did for some time allow certain amounts to be broken out as "benefits." Further, the employer is the individual who chooses how to characterize such income, and thus it could argue by using the definition "as reported for Form W-2 purposes" it incorporated the distinction embedded in the W-2 until 2001. This argument is somewhat bolstered by the August 1997 Tax Issues Memorandum that outlined the tax issues and emphasized that the housing allowance entailed "no additional cash compensation."

Therefore, because the relevant language is ambiguous and because this Court cannot say that the Committee's decision was arbitrary and capricious, the judgment of the district court is hereby AFFIRMED.