PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

Nos. 13-4633 & 13-4743

————————

JOHN COTTILLION; BEVERLY ELDRIGE,
on behalf of themselves and all others similarly situated,

Cross-Appellants in No. 13-4743

v.

UNITED REFINING COMPANY; UNITED REFINING
COMPANY PENSION PLAN FOR
SALARIED EMPLOYEES;
UNITED REFINING COMPANY
RETIREMENT COMMITTEE;
JOHN AND MARY DOES 1 TO 10

United Refining Company; United Refining
Company Pension Plan for Salaried Employees;
United Refining Company Retirement
Committee,

Appellants in No. 13-4633

———————————

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 1-09-cv-00140)
District Judge: Honorable Cathy Bissoon

———————————

Argued October 1, 2014

Before: AMBRO, CHAGARES,
and VANASKIE, Circuit Judges

(Filed: March 18, 2015)

Eugene D. Fowler, Esq.
Christopher J. Rillo, Esq.    (Argued)
Diane M. Soubly, Esquire
Rillo Law Group
111 Pine Street, Suite 1400
San Francisco, CA 94111
        *Counsel for Appellants/Cross Appellees*

Tybe A. Brett, Esq.   (Argued)
Ellen M. Doyle, Esq.
Joel R. Hurt, Esq.
Feinstein, Doyle, Payne & Kravec
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA 15219
        *Counsel for Appellees/Cross Appellants*

Jessica R. Amunson, Esq.
Jenner & Block
1099 New York Avenue, Suite 900
Washington, DC 20001

Craig C. Martin, Esq.
Matthew J. Renaud, Esq.
Amanda S. Amert, Esq.
Jenner & Block
353 North Clark Street
Chicago, IL 60654

Janet M. Jacobson, Esq.
The American Benefits Council
1501 M Street, N.W., Suite 600
Washington, DC 20005

Scott J. Macey, President and CEO
Debra Davis, Vice President
The ERISA Industry Committee
1400 L Street, N.W.
Washington, DC 20005

Kat Comerford Todd, Esq.
Steven P. Lehotsky, Esq.
Warren Postman, Esquire
National Chamber Litigation Center, Inc.
1615 H Street, N.W.
Washington, DC 0062
        *Counsel for Amicus Appellants/Cross-Appellees*

3

Mary E. Signorille, Esq.
Anita Khushalani, Esq.
AARP/AARP Foundation Litigation
601 E Street, N.W.
Washington, DC 20049
    *Counsel for Amicus Appellees/Cross-Appellants*

_____

OPINION

_____

AMBRO, <u>Circuit Judge</u>

The Employee Retirement Income Security Act of 1974 ("ERISA"), a law meant to guarantee that employees will receive the retirement benefits they are promised, governs pension plans. We determine whether the calculation of retirement benefits that the United Refining Company and co-defendants (who appeal and are collectively referred to throughout this opinion as "United") provided in a pension plan to a specific class of former employees (collectively, "Employees") varied, as United argues, depending on how old they were when they elected to receive the benefits. Because United's reading finds no support in the text of the plans, we affirm the rulings of the District Court.

## I.     Factual Background and Procedural History

John Cottillion worked at United for 29 years, from 1960 until 1989. He was 54 years old when he quit, and his benefits had vested under "the 1980 Plan," which is the version of United's Pension Plan for Salaried Employees that applies to people whose benefits vested (*i.e.*, became non-

forfeitable under ERISA) after 1980 but before 1987. Because his employment at United was long enough to vest benefits and he was too young on leaving United to receive those benefits, Cottillion belongs to the subset of former United employees involved in this lawsuit: "terminated vested participants" or "TVPs" in United's pension plan. TVPs are distinct from Early Retirees, who are not a part of this litigation; the latter are people who retired directly from United at an age older than 59½ or 60 (depending on the applicable Plan) but younger than 65.

When Cotillion left the company, United wrote a letter informing him that "[a]s a terminated Pension Plan participant with a vested interest, you are eligible for a deferred retirement benefit from the United Refining Company Pension Plan for Salary [*sic*] Employees." The letter further stated that he "may elect to have [his] monthly retirement benefit begin at anytime [*sic*] after October, 1995," the month in which Cottillion would turn 60, and that his "monthly retirement benefit will be $573.70 at age 60." The letter did not state that the amount of Cottillion's benefit depended on whether he elected to receive it at age 60 or later. TVPs under the 1987 Plan were likewise informed of their pension amounts and told they could receive them the month following their "59½ birthday . . . without any reduction for early retirement." *E.g.*, Beverly Eldridge, Application for Commencement of Deferred Vested Benefits, Terminated Vested Participants (Jan. 9, 1997).

On January 30, 2002, United amended and restated the plan, backdated to January 1, 1995 (the "1995 Plan"), to comply with then-recent amendments to ERISA. The Internal Revenue Service informed United that certain changes needed to be made to the Plan before it could issue a letter confirming that the 1995 Plan would receive favorable tax treatment; in response, United amended the 1995 Plan,

5

effective January 1, 2002 (the "2002 Plan"). Both the 1995 and 2002 Plans included a § 5.04(c), absent from the 1980 and 1987 Plans, stating that the benefits of TVPs who receive pensions before age 65 would be "actuarially reduced to reflect the earlier starting date thereof." Neither the 1995 Plan nor the 2002 Plan applies to any employee-plaintiff in this case, but they are relevant because of what happened next.

In 2005, plan actuaries (professionals who perform a variety of services relating to implementing and maintaining ERISA plans) at the firm Towers Perrin informed Lawrence A. Loughlin, the plan administrator, that United had erroneously paid to TVPs vested under the 1980 and 1987 Plans pensions that were not "actuarially reduced," *i.e.*, calculated in light of the TVP's age. (The younger a beneficiary is, the longer she will receive benefits, and thus retirement plans often lower benefits for people who take them early so that the benefits are worth the same regardless when they begin to be paid.) Because operational deviations from the terms of ERISA-governed plans can jeopardize their favorable tax treatment, John Owsen, United's (now deceased) longtime outside counsel for benefits matters, sent a letter to the IRS in November 2005 proposing to recoup the excess funds paid. Owsen's letter followed the IRS's voluntary correction program through which employers may notify the Service of proposals to fix mistakes in administering ERISA plans and receive assurance that the IRS will not disqualify a plan from favorable tax treatment. The letter cited and attached the 2002 version of § 5.04(c), but it did not call attention to the absence of this language in the 1980 and 1987 Plans. In March 2006 the IRS issued a "Compliance Statement," which affirmed that the IRS "will not pursue the sanction of Plan disqualification on account of the qualification failure described in the Submission," but cautioned that it "does not express an opinion as to the

6

accuracy or acceptability of any . . . material submitted with the application" and "should not be construed as affecting the rights of any party under any other law, including" ERISA.

In July and August 2005, after notification from Towers Perrin but before the IRS correspondence, United sent letters to TVPs who had not yet begun to receive benefits "to clarify when you can receive your pension from United Refining Company and under what terms." This letter stated that if a TVP elected to receive retirement benefits before turning 65, the benefit would be reduced to reflect the early election date in accord with the following table:

| Age | Factor |
|-----|--------|
| 64 | 89% |
| 63 | 80% |
| 62 | 72% |
| 61 | 65% |
| 60 | 59% |
| 59 ½ | 56% |

About a year later, United sent letters to TVPs who were already receiving pensions. These letters stated, "The Plan document requires that all pension benefits paid to terminated vested participants PRIOR to their Normal Retirement Age of 65 years MUST be actuarially reduced to the earlier payment date" (emphasis in original). Indeed, some retirees were told that in two weeks from the date of the letter their monthly pension would be lowered "until the excess payments have been recovered, after which you will begin receiving the amount that should have been provided to you based on the correct calculation." Others were told that in two weeks "your monthly pension benefit payment will stop and you will not receive any future payments.

Additionally, in order to recover excess payments, you should repay the Plan" the amount of money already paid that exceeded the actuarially reduced benefit. In Cottillion's case, his pension of $506.58 per month was eliminated, and he was told he should pay the Plan $14,475. The letters represented that the reductions were necessary for the Plan to retain its favorable tax treatment under the Internal Revenue Code and that the statements in the letter were "based on the [IRS]'s published revenue procedures and Compliance Statement which the Plan Retirement Committee must follow."

After receiving this letter, the Employees represent that Cottillion had a telephone conversation with Loughlin, the plan administrator and author of the letter, during which Cottillion complained about the reduction in pension benefits. Loughlin told him that the reduction corrected a mistake that had resulted in excessive payments. Several other aggrieved TVPs wrote to Loughlin, who replied by letter that the plan documents required the correction to maintain the plan's favorable tax treatment. Some, but not all, who complained were informed that they could file a written appeal of Loughlin's decision.

The Employees sued in the Western District of Pennsylvania alleging, as relevant here, that United's actions deprived them of a benefit to which they were entitled under the Plan, in violation of 29 U.S.C. § 1132(a)(1)(B), and that they violated ERISA's "anti-cutback" rule, 29 U.S.C. § 1054(g), which prohibits employers from amending a plan in a way that reduces benefits accrued under a defined benefit plan (such as the Plans at issue here). Judge Sean McLaughlin denied United's Motion to Dismiss and later granted the Employees' Motion for Summary Judgment in part and denied United's Motion for Summary Judgment, holding that United's actions violated the anti-cutback rule. When Judge McLaughlin resigned to enter the business

8

world, the case was assigned to Judge Cathy Bissoon. She granted the Employees' Motion for Class Certification, granted in part their Motion for Final Remedy (enjoining United from actuarially reducing Employees' benefits and awarding damages to make whole those who had been receiving too little, but declining to order United to pay anything to TVPs who had not yet elected to receive benefits), and granted United's Motion for Judgment on the Pleadings, dismissing with prejudice the Employees' remaining counts because any relief would be duplicative.

United appeals then-Judge McLaughlin's summary judgment decision and Judge Bissoon's order on remedies. The Employees cross-appeal the latter order and the award of judgment on the pleadings.

## II.    The District Court Properly Excused the Employees from Exhausting Plan Remedies.

United argues that it was entitled to summary judgment because the named plaintiffs failed to exhaust the remedies available to them under the Plan. *See, e.g.*, *Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002). The Employees do not dispute that ordinarily the named plaintiff in an ERISA class action must exhaust plan remedies before bringing suit and that Cottillion and Beverly Eldridge did not, but they argue that: (1) they were not required to exhaust remedies because of the nature of their claim; (2) exhaustion is an affirmative defense and United has not met its burden of persuasion on the issue; and (3) there is undisputed record evidence that exhaustion would have been futile.

While we review *de novo* the legal standard that a district court applies in determining whether an employee must exhaust plan remedies before coming to federal court,

9

the court's ultimate decision whether to require a plaintiff to exhaust is committed to its sound discretion. *Harrow*, 279 F.3d at 248; *see also D'Amico v. CBS Corp.*, 297 F.3d 287, 290 (3d Cir. 2002); *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 984 (9th Cir. 2001); *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 459 (6th Cir. 1992); *Springer v. Wal–Mart,* 908 F.2d 897, 899 (11th Cir.1990); *Janowski v. Int'l Bhd. of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 935 (7th Cir. 1982), *judgment vacated on other grounds*, 463 U.S. 1222 (1983).

The Employees argue that the exhaustion requirement does not apply to their anti-cutback claim based on 29 U.S.C. § 1054(g), as there is "a distinction . . . between claims based on pension rights created by contract, which must be [exhausted if the plan provides for remedies], and claims based on purely statutory rights created by ERISA, which may be asserted in federal court directly." *Delgrosso v. Spang & Co.*, 769 F.2d 928, 932 (3d Cir. 1985). We need not resolve whether in general the exhaustion requirement applies to an anti-cutback claim or whether this particular suit states "a simple contract claim artfully dressed in statutory clothing." *Drinkwater v. Metro. Life Ins. Co.,* 846 F.2d 821, 826 (1st Cir. 1988). As discussed below, the District Court did not abuse its discretion in holding that exhaustion would prove futile.

The Employees misconstrue the futility exception to the exhaustion requirement when they argue that, because exhaustion is an affirmative defense, United bears the burden of proving that it would not be futile. True, "[t]he exhaustion requirement is a nonjurisdictional affirmative defense" for United. *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 280 (3d Cir. 2007). Yet futility is an exception to the exhaustion requirement, and "[a] party invoking this exception must provide a clear and positive showing of futility before the

District Court." *D'Amico*, 297 F.3d at 293; *accord Harrow*, 279 F.3d at 249. Therefore, this argument against dismissal for failure to exhaust also fails.

In any event, the District Court held that the Employees had shown exhaustion of their Plan remedies would have been futile. As we wrote in *Harrow*:

> Whether to excuse exhaustion on futility grounds rests upon weighing several factors, including: (1) whether plaintiff diligently pursued administrative relief; (2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances; (3) existence of a fixed policy denying benefits; (4) failure of the [defendant] to comply with its own internal administrative procedures; and (5) testimony of plan administrators that any administrative appeal was futile. Of course, all factors may not weigh equally.

279 F.3d at 250.

The District Court excused the Employees from the exhaustion requirement because they showed that United had a fixed policy of denying benefits. *Cottillion v. United Ref. Co.*, No. 1:09-cv-140, 2013 WL 1419705, at *14–*15 (W.D. Pa. Apr. 8, 2013). The Employees made this showing by supplying the District Court with extensive correspondence between Loughlin and aggrieved TVPs. Loughlin sent form letters out to all TVPs apprising them of the reduction in their benefits. When anyone wrote back to him to complain, Loughlin would reply that the change in benefits was mandated by the IRS. Many of the letters failed to inform recipients of the possibility of an appeal. There is no

11

evidence in the record that any TVP got anywhere by seeking further review from Loughlin, and that United continues to adhere to the position that TVPs are only entitled to actuarially reduced benefits further supports the inference that exhaustion was futile. At least one TVP (Frederick Hane) followed the instructions in Loughlin's letter and the 1987 Plan's appeals procedures. But rather than demonstrate that the issues raised in Hane's letter were considered an appeal of an earlier determination, Loughlin (on behalf of the retirement committee) treated Hane's objections as "questions" and offered him no relief or opportunity for further review.

The failure of Hane's appeal, the existence of a fixed policy denying benefits as evidenced by the correspondence between Loughlin and the many TVPs with letters in the record, and the absence of any evidence before us to suggest that an appeal from Loughlin's letter was anything other than time wasted, lead us to conclude that the District Court did not abuse its discretion in applying the futility exception to the exhaustion requirement. Thus we continue.

### III. The Plans Unambiguously Afforded TVPs Retirement Benefits Without Actuarial Reduction.

The 1980 and 1987 Plans gave the plan administrator discretion in interpreting their terms. Thus, in evaluating the Employees' benefits-due claim, we review Loughlin's interpretation under a deferential standard and will uphold it unless it is arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120–21 & n.2 (3d Cir. 2012). However, the parties dispute the standard of review for the Employees' claim that Loughlin's interpretation of the Plan adopted in his letters to TVPs (that the Plan provided only actuarially adjusted benefits, contrary to United's earlier

12

representations) violated the anti-cutback rule. The Employees urge that the District Court correctly deferred to Loughlin's first interpretation of the Plans—that they provided benefits in the same dollar amount to TVPs who elected to receive them before age 65 as to those who began receiving them at age 65 or later—and correctly did not defer to the second one as the "reinterpretation" was really a *sub rosa* plan amendment to reduce accrued benefits in violation of the anti-cutback rule. United argues that under *Conkright v. Frommert*, 559 U.S. 506 (2010), Loughlin's final interpretation—the one allowing reduction of benefits—is entitled to deference.

We need not determine who has the better of this argument. As we shall see, no amount of deference can rescue Loughlin's second interpretation from its flat contradiction with the terms of the 1980 and 1987 Plans. We therefore assume without deciding that the deferential arbitrary and capricious standard applies, under which a "court may overturn a decision of the Plan administrator only if it is without reason, unsupported by the evidence or erroneous as a matter of law." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 439 (3d Cir. 1997) (internal quotation marks omitted) (quoting *Abnathya v. Hoffmann–LaRoche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993)), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Even under that standard, an administrator's "interpretation may not controvert the plain language of the document." *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997).

13

A. *The Plans' Texts Support the Employees' Position.*

To determine whether Loughlin's second interpretation contradicts the actual words of the 1980 and 1987 Plans, we quote the relevant provisions.

Article VII of the 1980 Plan reads:

7.01   Required Service for Vesting

If a Participant's employment shall terminate prior to his Normal Retirement Date [age 65, § 4.01] or an Early Retirement Date [age 60, § 4.02], for any reason other than death, he shall be entitled to a deferred vested Retirement Income if he is credited with at least ten . . . years of Vesting Service at the time of his employment termination. . . .

7.02   Amount and Commencement of Deferred Vested Retirement Income

The amount and time of commencement of a deferred vested Retirement Income to a Participant who satisfies the requirements of Section 7.01 shall be determined in accordance with the provisions of Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination. . . .

Section 5.03 provides:

A Participant who retires on an Early Retirement Date may elect to receive one of the following:

14

(a) His Accrued Retirement Income computed as of his Early Retirement Date commencing at the end of the month in which his Normal Retirement Date would have occurred.

(b) A reduced amount of Retirement Income to begin at the end of the month in which his Early Retirement Date occurs, computed so as to be a percentage of the benefit provided for him under paragraph (a) of this Section 5.03, in accordance with the following table:

| Number of Years Prior to Normal Retirement Date (Interpolate if not a Whole Number) | Percentage |
|---|---|
| 0 | 100.0% |
| 1 | 100.0% |
| 2 | 100.0% |
| 3 | 100.0% |
| 4 | 93.3% |
| 5 | 86.7% |

On October 27, 1988, United put in place "Amendment 5" to the 1980 Plan, effective July 1, 1987. Amendment 5, which applies to all class members covered by the 1980 Plan, in relevant part rewrites § 5.03 of the 1980 Plan to read in its entirety:

A Participant who retires on an Early Retirement Date will receive his Accrued Retirement Income computed as of his Early Retirement Date commencing at the end

of the month in which his Early Retirement Date occurs.

"Accrued Retirement Income . . . as of any particular date" is defined under § 5.02 as an amount to be computed in accordance with § 5.01, which lays out the method of calculation for the "annual rate of Retirement Income." Section 5.01 describes the method of calculation as (roughly speaking) a percentage of average compensation multiplied by time of service with United, with qualifications and complications not at issue in this appeal.

To summarize, per § 7.02 a TVP gets retirement income in accordance with § 5.03, which states that a participant who retires is entitled to "Accrued Retirement Income," which is calculated under § 5.01 with respect to a participant's average compensation and length of service with the company.

The 1987 Plan is quite similar as it concerns this appeal. Article VII provides:

7.01    Required Service for Vesting.

If a Participant's employment shall terminate prior to his Normal Retirement Date for any reason other than death, he shall be entitled to a deferred vested Retirement Income if he is credited with at least five . . . years of Vesting Service at the time of his employment termination. . . .

16

7.02 Amount and Commencement of Deferred Vested Retirement Income.

The amount of a deferred vested Retirement Income to a Participant who satisfies the requirements of Section 7.01 shall be determined in accordance with the provisions of Section 5.03, based on the Participant's Benefit Service and Average Compensation at the time of employment termination. . . .

Section 5.03 provides:

Early Retirement Annual Accrued Retirement Income.

A Participant who retires on an Early Retirement Date will receive his Accrued Retirement Income computed as of his Early Retirement Date commencing at the end of the month in which his Early Retirement Date occurs.

"Accrued Retirement Income" is the amount specified in § 5.02, which, as in the 1980 Plan, is the "amount computed in accordance with Section 5.01," which in turn provides a formula roughly based on a percentage of average compensation multiplied by the employee's tenure at United.

The Early Retirement Date under the 1987 Plan initially occurred the month after an employee turned 60, but it was lowered effective February 1, 1996, to age 59½.

A straightforward reading of the 1980 and 1987 Plans, consistent with United's early interpretations of these Plans, leads to the conclusion that TVPs were entitled to pensions in an amount that did not include an actuarial adjustment for the number of years younger than 65 that they were when they

retired. Under both plans, § 7.02 tells us that a TVP gets retirement income in accord with § 5.03, which states that a retiree is entitled to "Accrued Retirement Income," which is calculated under § 5.01 with respect to a participant's average compensation and length of service with the company. Not one of these provisions treats TVPs differently from people who retire directly from United, and no provision requires actuarial adjustment (read reduction) for taking retirement benefits early. Loughlin's second interpretation conflicted with the plain meaning of the terms of the Plans and thus denied the Employees benefits due them in violation of § 1132(a)(1)(B), notwithstanding the Plans' conferral on him of discretion to interpret Plan provisions. *Epright v. Envtl. Res. Mgmt., Inc. Health & Welfare Plan*, 81 F.3d 335, 342–43 (3d Cir. 1996) ("By imposing a requirement which is extrinsic to the Plan[s], [Defendants have] acted arbitrarily and capriciously.").

The second interpretation also violated the anti-cutback rule, which occurs when an "accrued benefit" is eliminated or reduced by a "plan amendment." 29 U.S.C. § 1054(g)(1). "There is no question but that a standard early retirement benefit, provided exclusively upon the satisfaction of certain age and/or service requirements, is an accrued benefit that is protected by" § 1054(g).[1] *Bellas v. CBS, Inc.*,

---

[1] The statute reads:

(g) Decrease of accrued benefits through amendment of plan

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title [neither of which applies in our case].

18

221 F.3d 517, 524 (3d Cir. 2000). Sections 7.01 and 7.02 of both Plans provide precisely the early retirement benefits described in *Bellas* and are thus "accrued benefits."

United argues, however, that the early retirement benefits are not "accrued benefits" because § 5.01 of both Plans provide calculations for "[t]he annual rate of Retirement Income payable to a Participant who retires on or after his *Normal* Retirement Date." (emphasis added). Thus, according to United, anyone who retires before his normal retirement date has no accrued retirement benefits. What this argument ignores is the combined effect of §§ 7.01, 5.03, 5.02, and 5.01. Section 7.01 vests retirement income in TVPs; § 5.03 directs the administrator to calculate TVPs' Accrued Retirement Income as of the date of early retirement, while § 5.02 states that the amount of Accrued Retirement Income is computed "in accordance with Section 5.01." In other words, §§ 5.01, 5.02, and 5.03 provide the method for computing TVPs' benefits, while § 7.01 actually confers the benefits, making them "accrued" within the meaning of ERISA.

Our Court's "view of what constitutes an 'amendment' to a pension plan has been construed broadly to protect

> (2) For purposes of paragraph (1), a plan amendment which has the effect of—
> > (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
> > (B) eliminating an optional form of benefit,
> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. 29 U.S.C. § 1054.

19

pension recipients." *Battoni v. IBEW Local Union No. 102 Employee Pension Plan*, 594 F.3d 230, 234 (3d Cir. 2010). "An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of" § 1054(g). *Hein v. F.D.I.C.*, 88 F.3d 210, 216 (3d Cir. 1996).[2]

The critical question in this case, in light of the absence of a formal plan amendment, is whether Loughlin's "interpretation of the Plan improperly denied accrued benefits to" the Employees. *Id.* at 216–17. The answer is yes. In 1988, United's understanding of the Plans accorded with the plain reading of the Plans that we have discussed above. By 2005, United had reinterpreted the Plans and decided that they required actuarial adjustments to the amounts paid to TVPs who took early retirement. This incorrect interpretation resulted in the improper denial of TVPs' accrued early retirement benefits and thus violated ERISA's anti-cutback rule.

---

[2] Some Circuits have taken a narrower view of the meaning of "amendment" than *Hein*—see *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 987 (9th Cir. 1997); *Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1451–53 (7th Cir. 1986)—but, as the Second Circuit has noted, a Treasury Regulation interpreting the provision of the Internal Revenue Code that implements 29 U.S.C. § 1054(g) supports our Court's view and is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 183 (2d Cir. 2013) (discussing Limitations on Availability of Benefits, 53 Fed. Reg. 26,050-01, 26,064 (July 11, 1988) (*codified at* 26 C.F.R. § 1.411(d)–4)).

## B.    *United's Counterarguments Fail to Persuade.*

United makes several arguments to the contrary, none convincing.   Its arguments can be grouped into four categories: (1) internal textual arguments (the text of the 1980 and 1987 Plans supports United); (2) external textual arguments (the text of documents other than the Plans supports United); (3) structural (the Plans address Early Retirees and TVPs in separate sections, and thus they treat differently these different kinds of participants); and (4) statutory (because ERISA sets a floor for benefits, we should interpret the Plans to provide only that floor absent a clear and express plan provision to the contrary).  We address each in turn.

### 1.    The Internal Textual Argument

United's argument from the Plans' text is that § 5.03 entitles only "[a] Participant *who retires* on an Early Retirement Date" to benefits (emphasis added).  They argue that "retire" means "retire from United," because "'Retirement Date' expressly required 'actual retirement' from the Company with an immediate right to draw down a pension benefit."  Opening Br. at 14.  (Recall that by definition all TVPs left United before they were old enough to retire from the company at age 59½ or 60.)   But no definition in any plan defines "retire" or "Retirement Date" with reference to separation from United.  Instead, both the 1980 and 1987 Plans (at § 1.31) define "Retirement Date" as the date of "actual retirement," but *not* actual retirement from United.

For support, United cites pages 1645 ¶ 18 and 1684 ¶ 27 of the Joint Appendix.  Both citations lead to United's statement of material facts in support of its motion for summary judgment, and that document in turn cites an expert

report by Nancy Keppelman (an ERISA lawyer) interpreting the Plans. Setting aside the problem of considering expert testimony on the interpretation of a pension plan, which is a purely legal question and not properly the subject of expert testimony, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (collecting circuit cases); *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan & Trust Agreement*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992), the expert does not even support United's interpretation of the meaning of "retire." Keppelman writes, "The cross-reference [from § 7.02 to § 5.03] did not confer early retirement benefits on [TVP]s." Keppelman Report 7, Jan. 24, 2012, ECF No. 154-14. It may be that "the cross reference" does not confer early retirement benefits, but § 7.01 explicitly does, and § 7.02 clarifies that the amount of the benefits conferred by § 7.01 "*shall* be determined *in accordance* with" § 5.03 (emphases added). By drafting an actuarial adjustment into the Plan, United is requiring the benefits to be calculated *not* in accordance with § 5.03, the exact opposite of the Plan's requirements.

### 2. The External Textual Argument

The extrinsic documents on which United relies further undermine its position. It posits that § 5.04(c) of the 1995 and 2002 Plans made explicit what had been true all along: TVPs who took their pensions before turning 65 would be entitled only to actuarially adjusted pensions. But even if it were permissible to look to the 1995 and 2002 Plans for guidance in interpreting the 1980 and 1987 Plans, the addition of § 5.04(c) more strongly supports the Employees' position that, without the new language explicitly imposing an actuarial adjustment, there was no such adjustment before.

United also points to certain summary plan descriptions ("SPDs") to argue they clarify that actuarial

22

adjustments are required under the Plans. The 1987 and 1995 SPDs (which describe the 1980 and 1987 Plans, respectively) state that employees who took vested retirement benefits earlier than their normal retirement date would only be entitled to actuarially reduced benefits.

United's reliance on the SPDs poses two principal problems. First, the SPDs state that "[i]f the terms of the Plan document and the Trust agreement and of this summary are inconsistent, the terms of the Plan document and the Trust agreement will control." United Refining Company, Pension Plan for Salaried Employees, Summary Plan Description 20 (Jan. 1 1987); United Refining Company, Pension Plan for Salaried Employees, Summary Plan Description 20 (Jan. 1 1995). When the SPD contains this sort of a disclaimer and the Plan is more favorable to beneficiaries than the SPD, the Plan controls. *Sturges v. Hy-Vee Employee Ben. Plan & Trust*, 991 F.2d 479, 480–81 (8th Cir. 1993) (*per curiam*); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 542–43 (4th Cir. 1992); *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1201 (10th Cir. 1992). As discussed, the SPDs conflict with the Plans, as the Plans clearly do not contemplate actuarial adjustment.

Second, United published employee handbooks in 1985, 1991, 1994, and 1998 that are wildly inconsistent on whether benefits are calculated with actuarial adjustment, and the Employees not implausibly characterize the handbooks as, by their own terms, SPDs. *See, e.g.*, United Refining Company, Salaried Employee Handbook 110 (Apr. 1, 1994) ("The handbook contains Summary Plan Descriptions of the plans . . . ."). The 1985 handbook (published before Amendment 5 to the 1980 Plan removed its actuarial adjustment table) stated that pension benefits both for Early Retirees (people who retired directly from United after age 59½ or 60 and before age 65) and TVPs who took benefits

23

before their Normal Retirement Date would be actuarially reduced. The 1991 handbook contained no mention of actuarial adjustments for early receipt of benefits. The 1994 handbook stated of TVPs, "You can begin receiving benefits as early as age 60 with no reduction." *Id.* at 84. The 1998 handbook is less quotable, but it includes a sample calculation for a person who retires (not necessarily a TVP) at age 59½ and does not include an actuarial adjustment for the participant's age. Indeed, nowhere in the 1998 handbook is there any indication that anyone's benefits might be actuarially reduced. These handbooks' differences with each other and with the SPDs strengthen our conviction that the plain meaning of the Plans should control.

### 3. The Structural Argument

United's structural argument is stronger, but not strong enough. It relies on expert reports from an actuary (Ian Altman) and an ERISA lawyer (Keppelman), who point out that Article 5 of the Plans addresses benefits for Early Retirees—those who retire from United directly before turning 65—while Article 7 addresses benefits for TVPs. If the plans intended to treat the two categories of participants similarly, why devote a separate section to each group? The question, though provocative, does not overcome the indisputable facts that the TVP section explicitly informs readers that TVPs' benefits are to be calculated "in accordance with" Article 5 and that *nothing* in either the 1980 Plan or the 1987 Plan refers to actuarial adjustments for people who elect to receive their pensions early. The structure and language of the plan could be read to suggest that without Article 7 TVPs would be entitled to nothing more than ERISA's statutory floor, but with Article 7 they are entitled to what Article 7 provides, which is benefits calculated in accordance with Article 5.

24

### 4. The Statutory Argument

United's statutory argument fares no better. ERISA § 206(a) does provide that TVPs are entitled to "no less than" an actuarially reduced benefit. 29 U.S.C. § 1056(a). But for the reasons stated above, these Plans expressly provided TVPs with more than the statutory floor. Imposing a requirement that a plan be even clearer than the one in this litigation would be unreasonable. The case United relies on—*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007)—only exposes its argument's weakness. In *McCarthy*, when a TVP took payment early, the

> benefit was actuarially reduced from the amount that would have been paid at age 65 in two respects. First, to reflect the time value of money, the Master Retirement Plan reduced the benefit by a 6.75 percent discount rate for each year prior to the age of 65 that payments began. Second, the benefit was reduced by a mortality factor to adjust actuarially for the possibility that a participant might not live to the age of 65.

*Id.* at 189. These explicit provisions are the opposite of what we find in United's Plans; far from a reference to actuarial adjustment or silence that could arguably be understood only to provide the minimum pension allowed under ERISA, the 1980 and 1987 Plans set out a detailed scheme for calculating TVPs' benefits, one that expressly omits any actuarial adjustment.

## IV. United Forfeited Any Objection to the District Court's Interest Rate.

United next argues that, even if we hold that it owes the Employees benefits without actuarial adjustment (as we

25

do), the District Court erred in its final order on remedies when it ordered United to pay interest at 7.5% on the Employees' damages. The Court ordered this amount of interest based on the 2002 Plan, which set 7.5% as the rate of interest for actuarial calculations and on the basis of United's IRS submission, which laid out the company's plan to recoup excess payments to TVPs at 7.5% interest. *Cottillion v. United Ref. Co.*, No. 1:09-cv-140, 2013 WL 5936368, at *9 (W.D. Pa. Nov. 5, 2013). United asserts that because certain sections of the Plan that entitle participants to lump sum payments state that the interest rate in those contexts is the 30-year Treasury rate, the interest here should be 3.7%.

We need not rule on this objection because it is raised for the first time in United's reply brief and hence is waived. *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 151 & n.1 (3d Cir. 2001). Moreover, although reasonable objections could be made to the District Court's choice of an interest rate, United's proposed rate has no better grounding in the Plan documents (the sections that specify the 30-year Treasury rate apply only to lump sum payments in the event the Plan is terminated or in the case of employees with very small pension entitlements). And because there is some evidence that the Plan provided 7.5% as a default rate, the District Court's order was not clearly erroneous.

## V. The Employees Are Not Entitled to More Relief Than the District Court Ordered.

When the District Court entered its final order on remedies, it concluded that class members who had not yet elected to receive their benefits were entitled only to an option to start receiving properly computed benefits at the appropriate age under the Plan (or immediately if they were older than 59½ or 60, depending on the Plan). If they were older than 59½ or 60, they were *not* entitled to receive

damages in the amount of benefits they would have received had they elected to receive (properly computed) benefits as early as possible plus interest. According to the District Court, that relief would be "entirely speculative." *Cottillion*, 2013 WL 5936368 at \*8.

The Employees claim that "there is no economic incentive for a [TVP] to delay commencing an unreduced monthly benefit past his Early Retirement Date." Employees' Response and Cross-Appeal at 62. They are mistaken. In fact, they do not dispute that entitlement to benefits requires "actual retirement." 1980 Plan § 1.31; 1987 Plan § 1.31. Because retirement benefits are generally less than salary, there is an incentive to keep working and to continue to be paid for full-time work instead of electing to receive pension benefits conditioned on retirement.

The Employees advance three other theories to argue that that the District Court's injunction should be modified to allow TVPs to receive the payments to which they would have been entitled absent the reinterpretation—namely, unjust enrichment, surcharge, and restitution. All of these rationales suffer from the same flaw: the Employees failed to prove in the District Court that class members would have taken unreduced pension benefits early.

The Employees do not seek remand to prove on an individual basis that those eligible for unreduced early retirement benefits who have not yet elected to take them (or who only took them after turning 65) would have taken them earlier but for United's new interpretation of the Plan. In a footnote, the Employees suggest that "the court could order retroactive benefits using a utilization factor based on an assumption that individual class members would have delayed commencing an unreduced benefit by the average of such delays prior to the cutback, as proposed by [their]

27

expert." Employees' Response Br. and Cross-Appeal at 65 n.20. However this suggestion would play out, the injured class members suffered individualized damages, and this sort of aggregate proceeding violates the ordinary rule that "a class action cannot be certified in a way that . . . masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) (rejecting as "abridging a substantive right" the extrapolation of class-based damages from a sample of the class).

The Employees' final argument readily fails. They contend that the District Court should not have dismissed the remaining counts of their complaint as duplicative of the anti-cutback claim because it failed to award them full relief on the anti-cutback count. In other words, they claim that the order granting judgment on the pleadings to United should be reversed for the same reasons that they contend the damages awarded were inadequate. But because the Employees have received the full remedy to which they are entitled, anything more would indeed be duplicative. Thus, the District Court's decision was proper.

## VI. United's Pending Motions

There remain two motions pending: United's Motion for Stay of District Court Judgment and its Motion to Strike Part H of the Employees' Brief. The Motion to Stay is denied as moot in light of our disposition of the appeal.

Part H of the Employees' Fourth Step Brief responds to arguments that, they say, were improperly raised in United's Second Step Brief. United is correct that the Employees should not have responded to these arguments by way of a reply brief, but should have either moved for leave to file a sur-reply or moved to strike United's arguments. *See*

Fed. R. App. P. 28.1(c)(4); *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 201–02 (3d Cir. 2006). The Motion is granted insofar as it attacks all but the last paragraph of Part H, which responds to a letter by United informing us of a non-precedential opinion that the Employees (rightly) argue is irrelevant (like all the other cases brought to our attention by United's *six* 28(j) letters). For these reasons, all but the last paragraph of Part H is stricken as an impermissible sur-reply filed without leave.

\* \* \* \* \*

United provided detailed pension plans that clearly explained how to calculate payments owed to those who, like the Employees here, earned accrued benefits and left United before they were eligible to receive them. The Plans' method of calculation did not include an actuarial adjustment for participants who took benefits before turning 65, and ERISA forbids United from drafting those reductions into the Plans whether by amendment, "interpretation," or otherwise. United must pay the Employees what it promised, and thus the careful and thorough judgments of the District Court are affirmed.