NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0420n.06

No. 16-2246

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 19, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBERT JOHNSTON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| DOW EMPLOYEES' PENSION PLAN and DOW | ) | EASTERN DISTRICT OF |
| CHEMICAL COMPANY RETIREMENT | ) | MICHIGAN |
| BOARD, | ) | |
| | ) | |
| Defendants-Appellees; | | |

BEFORE: GIBBONS, SUTTON, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff Robert Johnston appeals the district court's grant of judgment on the administrative record in favor of defendants Dow Employees' Pension Plan and Dow Chemical Company Retirement Board (collectively, the "board"). Johnston alleges that the board miscalculated his pension benefit by failing to apply the unambiguous terms of the pension plan and that the board's interpretation violates ERISA's anti-cutback rule. However, because the board's determinations were not arbitrary or capricious or in violation of the anti-cutback rule, we affirm the denial of Johnston's claims.

I.

Robert Johnston began working for Dow Chemical in 1980. In March 1996, Johnston was transferred to a newly formed Dow joint venture, Dow DuPont Elastomers ("DDE"). Johnston worked at DDE until June 30, 2005, at which point he was transferred back to Dow. He then worked at Dow until he took early retirement on September 30, 2011.

Johnston is entitled to a pension under the Dow Employee Pension Plan ("Plan"), which is to be offset, to some degree, by the separate pension he receives from his prior work with DDE. The pension benefit provided for under the Plan is an "employee pension benefit plan" subject to the requirements of the Employee Retirement Income Security Act ("ERISA").

Before Johnston commenced his pension benefit with Dow, he objected to the pension calculation provided by the company. Pursuant to the Plan's pension-calculation review procedures, Johnston's claim was reviewed by an "Initial Claims Reviewer," who denied his claim. After this initial denial, Johnston made further inquiries to the Initial Claims Reviewer, who, after some delay, provided Johnston with answers to his questions.[1] The Initial Claims Reviewer also granted Johnston an extension to file an appeal with the Dow Retirement Board, which serves as the "Appeal Administrator" under the Plan. In August 2012, Johnston filed a timely appeal of the Initial Claims Reviewer's decision.

The Board affirmed the denial of Johnston's claim. Johnston then appealed that decision to the district court. On the board's motion for summary judgment on the administrative record, the district court affirmed the board's decision, finding that it was not arbitrary or capricious. This appeal followed.

## II.

We review *de novo* a challenge to an ERISA plan's denial of benefits, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the [P]lan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *see also Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011). Where the plan administrator is given such authority, its

---

[1] Johnston's follow-up request for additional information was made on September 27, 2011. He did not receive a formal response until June 12, 2012.

decision is reviewed under the "arbitrary and capricious standard." *Firestone*, 489 U.S. at 115. We "give fresh review to the district court's ruling on the administrative record," but apply the same arbitrary-and-capricious standard as the district court when reviewing the plan administrator's decision. *Godleski v. FirstEnergy Corp.*, 477 F.3d 403, 405 (6th Cir. 2007). The district court's, as well as this court's, review of a plan administrator's denial of benefits under an ERISA plan is limited to the administrative record that was before the board. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660 (6th Cir. 2004) (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998)).

The arbitrary-and-capricious standard of review is "the least demanding form of judicial review of administrative action." *Farhner*, 645 F.3d at 342. And although this standard of review is not without some teeth, "it is not all teeth." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014). Indeed, for "[a]n extremely deferential review[] to be true to its purpose, [it] must actually honor an extreme level of deference to the administrative decision." *Id.* (internal quotations omitted). Thus, "[a] decision reviewed according the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* at 1064–65 (internal quotations omitted) (quoting *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010)). Stated differently, a decision is not arbitrary or capricious if it is "rational in light of the plan's provisions," or when it is possible to "offer a reasoned explanation, based on the evidence, for a particular outcome." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (quoting *Davis v. Ky. Fin. Cos. Ret. Plan.*, 887 F.2d 689, 693 (6th Cir. 1989)).

Here, Plan § 7.1 grants discretionary authority to Dow's Plan Administrators, and the board's decision thus should be upheld unless it is found to be arbitrary or capricious.[2] Despite this unequivocal grant of discretion, Johnston claims that a different, or somehow "tempered," standard of review should apply. His arguments are unavailing.

First, Johnston asserts that the grant of discretion here is too vague because it gives "discretionary authority to an unlimited number of individuals." (CA6, R. 19, Appellant Br. at 57.) He claims that the Plan's terms result in a circular definition in which anyone who exercises discretion is granted discretion. But there is nothing wrong with having multiple fiduciaries with discretionary authority within a plan. *See Farhner*, 645 F.3d at 342 (applying the arbitrary-and-capricious standard to a grant of discretion to the "Plan Administrator and other Plan fiduciaries"). Additionally, the Plan grants such authority not to an unlimited number of people, but to those designated as "Initial Claims Reviewers" and to the "Appeals Administrator," which is the Retirement Board.

Second, Johnston claims that, because the Plan's terms are unambiguous, the board's decision must be reviewed *de novo*. We have previously rejected this argument. *See Radell v. Michelin Ret. Plan*, 578 F. App'x 483, 489 (6th Cir. 2014) ("When interpreting the language of an ERISA plan, this court will apply a plain-meaning construction and give effect to its unambiguous terms, but those principles do not change the applicable standard of review." (internal quotations and citations omitted)). True, where a plan's terms are unambiguous and a

---

[2] Section 7.1 provides that:

> Each Plan Administrator shall be a "named fiduciary" within the meaning of 402(a)(2) of ERISA with respect to, and shall have the exclusive power and authority to control and manage, the operation and administration of the Plan. The principal duty of such Plan Administrator shall be to see that the Plan is carried out in accordance with its terms and for the exclusive benefit of Participants and their Spouses and Beneficiaries.

(DE 131-2, Plan § 7.1, Page ID 8101.) Section 7.1(b) specifically grants Plan Administrators the authority to "interpret the Plan and to resolve any possible ambiguities, inconsistencies and omissions therein and therefrom." (*Id*.)

plan administrator disregards that plain language, its actions are more likely to be arbitrary or capricious. But the deferential standard of review that courts must apply to that decision is unaltered.

Finally, Johnston claims that the board has a conflict of interest that necessitates a different standard of review. But, again, we have rejected his argument. *See Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005); *see also Canada v. Am. Airlines, Inc. Pilot Ret. Benefit Program*, 572 F. App'x 309, 312 (6th Cir. 2014) ("[A]lthough American both funds the Plan and determines Plan eligibility, the district court properly factored the airline's dual role and inherent conflict of interest into its *application* of the arbitrary-and-capricious standard rather than imposing a heightened standard of review altogether."). As the Supreme Court has made clear, a potential conflict of interest is just one "factor" for courts to consider when determining whether a board's action was arbitrary or capricious—the standard of review remains the same. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (adhering to the arbitrary-and-capricious standard of review while eschewing "*de novo* review" or "special burden-of-proof rules" for ERISA conflict-of-interest cases); *see also Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009).

The district court correctly found that there was little depth to most of Johnston's conflict-of-interest arguments. Johnston alleges that the board's retention of outside counsel to advise it in processing his claim indicates a conflict of interest. The conflict is apparent, he asserts, because this outside law firm ensured that the process was an adversarial one, "aimed at bolstering the case for denial rather than providing the 'full and fair review' required." (CA6, R. 19, Appellant Br. at 59.) But we have suggested that retention of outside counsel does not indicate a conflict of interest and does not alter the standard of review. *Kovach v. Zurich Am.*

*Ins. Co.*, 587 F.3d 323, 329 (6th Cir. 2009). Instead, as the district court noted, we have held that the retention of "outside counsel to assist [a plan administrator] in its claim determination would in fact seem to demonstrate that it took the process seriously and attempted to ensure that its decision had a strong legal basis." *Id*. And, if the retention of outside counsel does not indicate a conflict of interest where the plan is silent about such counsel, *id*., it certainly does not do so where, as here, the plan expressly provides that outside counsel may be retained to assist with claims.

Johnston also points to certain "procedural irregularities" in the processing of his claim that he asserts evince biased decision making, but any irregularities are at least somewhat of Johnston's own making. He asked for an expedited response to his inquiry about his pension being improperly calculated. The Initial Claims Reviewer responded promptly, which then resulted in a follow-up email from Johnston in which he made detailed requests for a large amount of documentation. The formal response to this request took a considerable length of time, but the Initial Claims Reviewer stayed in constant contact with Johnston about the status of his claim. Further, although the board may have been tardy in sending Johnston a letter detailing its reasoning for denying Johnston's claim, that delay, too, was necessitated by Johnston filing a voluminous ninety-page appeal.[3] But neither of these events, in and of itself, is evidence of bias. Johnston himself does not articulate a credible reason for how these delays demonstrate bias, other than to say that "they make no sense in the absence of an improper financial motive." (CA6, R. 19, Appellant Br. at 62.) Yet, delays in responding to unusually complex and lengthy pension-benefit claims make a good deal of sense, with or without any financial conflict. And,

---

[3] The board concedes that Johnston did not receive a letter notifying him of the denial of his appeal until after the 120-day deadline had expired. It seems to suggest, however, that it did, in fact, "determine" his appeal within the 120-day window by deciding to deny the claim on November 2, 2012. (*See* DE 131-2, Plan § 7.10, Page ID 8107 ("In no event shall the *determination* [of the appeal] take longer than 120 days after receipt of the request for review." (emphasis added)).)

as the district court noted, Johnston presented no evidence that he was prejudiced by any of these delays or that they in any way affected the outcome of his appeal. Johnston has not pointed to "substantial evidence" of a conflict of interest in this case, and accordingly, to the extent there is any conflict, we, like the district court, give that factor little weight in reviewing the board's decision.

## III.

Johnston raises three issues on appeal. First, he claims that the board should have used § 9.6(b)(i)(B) to calculate his benefit, rather than § 10.46(c)(i). Second, he alleges that, even if § 10.46(c)(i) does apply, it should not be employed because, as an amendment that allegedly reduces his benefit, it violates ERISA's anti-cutback rule and its notice requirements. Related to this second claim is Johnston's assumption that § 9.6 would provide him a larger benefit than § 10.46—an assumption considered, and rejected, by the board and the district court. Third, Johnston alleges that his average annual income (known under the Plan as "HC3A") was incorrectly calculated.

As to the first issue, § 9.6(b)(i)(B) and § 10.46(c)(i) are in conflict, and thereby create an ambiguity that the board reasonably resolved. Next, the board determined that Johnston's benefit was greatest under § 10.46, nullifying Johnston's notice and anti-cutback-rule claims. And finally, the board gave a reasoned explanation of its HC3A determination, which reconciled a benefits freeze with Johnston's status as a pensioner entitled to benefits under § 10.46(c)(i). The board did not act arbitrarily or capriciously in rendering these decisions and its interpretation of the plan does not violate the anti-cutback rule.

A.

"All matters of interpretation begin with the text; some end there." *Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 335 (6th Cir. 2014). Section 10.46 of the Plan is titled "Transfers from DuPont Dow Elastomers [DDE] Pension and Retirement Plan." (DE 131-2, Plan § 10.46, Page ID 8185.) From there, the section states that there are three categories of employees whose pensions are governed by it: (1) employees who were first hired by DDE; (2) former employees who were transferred to DDE from DuPont; and (3) former employees who were transferred to DDE from Dow. Employees in this final category have their pensions governed by §§ 10.46(c)(i)–(ii). Provision (c)(i) is the subsection relevant to this appeal, and it states:

> Former employees transferred to DDE from [Dow], as part of the asset transfer July 1, 1997, to the DuPont Dow Elastomers Pension and Retirement Plan, who are transferred back to [Dow] shall be granted Vesting Service, Eligibility Service and Credited Service equal to the corresponding service earned under the Plan before such transfer plus the service earned under the DuPont Dow Elastomers Pension and Retirement Plan. Provided, however, that any benefit earned under the Plan shall be reduced by any benefit . . . that may have been earned under the DuPont Dow Elastomers Pension and Retirement Plan.

(DE 131-2, Plan § 10.46(c), Page ID 8187.) As Johnston is indisputably an employee who was transferred to DDE from Dow, a quick review suggests that this provision must apply to him.

But Johnston offers several rejoinders. First, Johnston alleges that his pension should be calculated instead under § 9.6(b)(i)(B)—a section that governs employees who are transferred from certain Dow affiliates to Dow and, thus, either begin or return to coverage under the Plan. DDE was one of the affiliates to which § 9.6 was originally intended to apply. For the employees who qualify for it, § 9.6(b)(i)(B) provides that:

> Such Employee shall be entitled to benefits under the Plan on the basis of Compensation, Credited Service, Vesting Service and Eligibility Service earned under the terms of the Plan while an Employee aggregated to include

8

> compensation, credited service, vesting service and eligibility service (all as defined hereunder) earned at such other entity related to [Dow] multiplied by a fraction, the numerator of which is the Credited Service with [Dow] and denominator of which is the Credited Service with [Dow] plus the credited service (as defined hereunder) with such other entity related to [Dow].

(DE 131-2, Plan § 9.6(b)(i)(B), Page ID 8123.) Importantly, § 9.6(b)(i)(B) begins with the proviso that it shall apply "[n]otwithstanding any provision of the Plan to the contrary." (*Id.*)

The board considered this argument, but noted that the preamble to Article X, which contains not only § 10.46 but many other provisions that address employees transferred from specific Dow affiliates, declares, "[w]hen the provisions of this Article differ from the provisions of the rest of the Plan, the provisions of this Article shall prevail." (DE 131-2, Plan Art. X, Page ID 8156.) Thus, since § 9.6 and § 10.46 are in conflict, yet each claims to supersede any conflicting provision, their application is ambiguous.

The Plan envisions such a conflict, and grants the board the power "[t]o interpret the Plan and to resolve any possible ambiguities, inconsistencies and omissions therein or therefrom." (DE 131-2, Plan § 7.1, Page ID 8101.) The board's decision to apply § 10.46 over § 9.6 is not arbitrary or capricious. The specific usually governs over the general, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."), and the board explained that this was its reason for applying § 10.46 over § 9.6. It is reasonable to assume that a later added provision, which governed employees transferred from specific Dow affiliates, was intended to supersede § 9.6, which lumped all transferees together. Additionally, the board asserted, and Johnston has offered no proof to the contrary, that it has consistently interpreted Article X provisions as superseding § 9.6 and that it has done so with former DDE employees under § 10.46 specifically.

Johnston next asserts that § 10.46(c) cannot apply to him because he does not fit into either of the types of former DDE employees that the subsection claims to govern. Section 10.46(c) is divided into two subparts. Section 10.46(c)(i) applies to employees who were part of the July 1, 1997 asset transfer. Section 10.46(c)(ii) applies to those employees who were transferred post-July 1, 1997. It is undisputed that Johnston was transferred before July 1, 1997, so the question is whether he was part of the July 1, 1997 asset transfer.

The board found that Johnston was part of that asset transfer. In doing so, the board noted that it had applied § 10.46(c)(i) to former Dow employees who, like Johnston, were "transferred to DDE from Dow during the early stages of the DDE joint venture, whose benefits under the Plan were transferred to the DDE plan, and who returned to Dow at or after the conclusion of the DDE joint venture." (DE 131-8, A.R. 190, Page ID 12367.) The board has also produced extrinsic evidence that Johnston was, in fact, part of the July 1, 1997 asset transfer. Johnston asserts, however, that the extrinsic evidence[4] instead supports that his assets were transferred before the July 1, 1997 asset transfer, rendering § 10.46(c)(i) inapplicable to him. Letters from DDE confirm that Johnston's asset records were transferred to the DDE plan, and they indicate that Johnston's transfer balance was calculated on March 31, 1996—his last day of pre-DDE Dow employment. Johnston claims that this definitively proves that the board arbitrarily determined that he was part of the July 1, 1997 asset transfer. Johnston is mistaken.

---

[4] Johnston argues that the board impermissibly turned to extrinsic evidence to create an ambiguity where none would otherwise exist. He seems to suggest that, because he has shown that his transfer of assets was before July 1, 1997 (something he has not actually accomplished), that ends the matter. This ignores, of course, that in order to make this showing he, too, must rely on extrinsic evidence. This is so because § 10.46(c)(i) by its terms requires a look to the extrinsic evidence to determine if that provision applies. Johnston's true gripe, it seems, is that the board, in considering the extrinsic evidence, ruled against his claim.

The board produced evidence[5] that Dow decided that, "for employees who left Dow to go to DDE . . . , [t]he final decision was to include employees who transferred *through* June 30, 1997." (DE 132, D.R. 28, Page ID 12575 (emphasis added).) This certainly includes Johnston, who claims his assets were transferred as of March 31, 1996. In fact, the board produced a spreadsheet that it claims includes Johnston in the July 1, 1997 asset transfer. Further, as mentioned above, the board asserts that it has been consistent in its process for categorizing former Dow employees who were transferred to DDE during the early stages of the joint venture. Though the board has admitted that it could not locate the precise date of Johnston's asset transfer, the evidence available to the board supports its decision to include Johnston in the July 1, 1997 asset-transfer group. As the board's decision was "the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence," *see McClain*, 740 F.3d at 1064, we find that it was neither arbitrary nor capricious.

B.

Johnston next claims that § 9.6(b)(i)(B) should apply because it would provide him with a greater benefit than § 10.46(c)(i). He alleges that § 10.46(c)(i), as an amendment to the Plan, was enacted in violation of ERISA's notice requirements and that its application violates the statute's "anti-cutback" rule, which, generally speaking, prohibits plan amendments that reduce a pensioner's accrued benefits. *See* 29 U.S.C. § 1054(g). The board concluded, however, that

---

[5] There was a dispute before the district court about which documents were part of the administrative record. That dispute splintered the record into three parts: the agreed upon administrative record, Johnston's record, and the board's record. The district court, however, decided that the board's record should be considered part of the administrative record, despite Johnston's objections. It did so based on the affidavits of those who took part in the decision-making process—including Deborah Salow, the Initial Claims Reviewer for Johnston's claim, and Michael Personke, chairman of the Retirement Board at the time it rendered its decision on Johnston's claim. This court has previously upheld the use of ERISA decision makers' affidavits in determining what evidence was before the board and should thus be part of the administrative record on the district court's, as well as this court's, review. *See Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457–58 (6th Cir. 2003). The district court did not abuse its discretion in considering the board's evidence over Johnston's objection. *See id.* at 457 (noting that this court reviews "for an abuse of discretion all evidentiary rulings of the district court").

Johnston's benefit was greater under § 10.46(c)(i), and thus that there was no notice requirement and that the enactment of § 10.46(c)(i) did not violate the anti-cutback rule.

Here we are confronted with the primary issue in this case: does § 9.6(b)(i)(B) or § 10.46(c)(i) provide Johnston with the greater benefit? Section 9.6(b)(i)(B), under which Johnston wishes to have his benefit calculated, states:

> Such employee shall be entitled to benefits under the Plan on the basis of Compensation, Credited Service, Vesting Service and Eligibility Service earned under the terms of the Plan while an Employee aggregated to include compensation, credited service, vesting service and eligibility service (all as defined hereunder) earned at such other entity related to [Dow] multiplied by a fraction, the numerator of which is the Credited Service with [Dow] and denominator of which is the Credited Service with [Dow] plus the credited service (as defined hereunder) with such other entity related to [Dow].

(DE 131-2, Plan § 9.6(b)(i)(B), Page ID 8123.) The parties agree on the denominator—Johnston has worked a combined 31.8 years for Dow and DDE. The numerator is the source of contention. Johnston claims that it should be 22.5 years, which amounts to his 16.2 years of pre-DDE Dow service plus his 6.3 years of post-DDE Dow service. In contrast, the board finds that the numerator should be 6.3 years. It bases its finding on a reading of § 9.6(b)(i)(B) with § 4.10, which prevents the duplication of benefits under the Plan.

> Section 4.10 states that:
>
> There shall be no duplication of benefits payable under this Plan and under any over private qualified retirement plan to which [Dow] or any Subsidiary or affiliated corporation contributes or has contributed . . . . If a Participant . . . shall be eligible for a benefit under any such plan . . . and shall also be eligible for a benefit hereunder based upon the same period of service by the Participant, then the amount of such other benefit received . . . shall be deducted from the benefit payable hereunder for such same period of service.

(DE 131-2, Plan § 4.10, Page ID 8067–68.) The board, considering that Johnston's pre-DDE Dow benefit had been transferred to DDE, excluded that period of Dow service from the

numerator.[6]  Because his initial 16.2 years of pension-benefit service were transferred to DDE, and because he receives credit for those years pursuant to his DDE pension, giving him credit under his Dow pension for those same 16 years would result in impermissible double counting. This resulted in a much smaller benefit under § 9.6(b)(i)(B) and thus led the board to apply § 10.46(c)(i) to Johnston's pension.

All agree that if § 4.10 does not exclude Johnston's pre-DDE Dow service, § 9.6(b)(i)(B) provides a greater benefit than § 10.46(c)(i), requiring that § 9.6(b)(i)(B) apply to avoid a violation of the anti-cutback rule.  There are two hurdles to § 4.10's application to § 9.6(b)(i)(B). The board's interpretation narrowly clears both.

1.

The first hurdle requires us to determine if ERISA § 204(g)'s anti-cutback rule bars the board from interpreting § 4.10 to prevent double counting under § 9.6(b)(i)(B).  If it does, § 9.6(b)(i)(B) provides a greater benefit than § 10.46(c)(i), and § 10.46(c)(i)'s application would, too, violate the anti-cutback rule.  Put simply, one cutback leads to another.

There is a circuit split on what constitutes an "amendment" under ERISA § 204(g)'s anti-cutback rule.  Because the term "amendment" implies a change to the existing document, one would assume that two contemporaneously adopted provisions, like § 4.10 and § 9.6(b)(i)(B), could not "amend" each other.  Yet some courts, including ours, subscribe to a broad interpretation of "amendment" that may encompass contemporaneously adopted amendments. *See Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 712 (6th Cir. 2000) ("[A]n erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of ERISA § 204(g). We see no

---

[6] In its decision, the board mistakenly referred to the provision Johnston wished to have his benefit calculated under as § 9.6(a)(vi). This appears to be a typographical error.  The parties agree that either § 9.6(b)(i)(B) or § 10.46(c)(i) applies to Johnston.

reason why an amendment that interprets a plan may not likewise be considered an "amendment" for purposes of § 204." (internal quotations and citations omitted)); *see also Cottillion v. United Refining Co.*, 781 F.3d 47, 58 (3d Cir. 2015) ("An erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment' for the purposes of § 1054(g)"); *Hein v. FDIC*, 88 F.3d 210, 216 (3d Cir. 1996).[7]

There seem to be at least two types of cases where provisions that are not formal amendments may violate the anti-cutback rule. *See Kirkendall*, 707 F.3d 173, 184 (2d Cir. 2013) ("Even broadly interpreted, the word "amendment" contemplates that the actual terms of the plan changed in some way or that the plan improperly reserved discretion to deny benefits, 26 C.F.R. § 1.411(d)–4." (internal citations omitted)). The first type are cases of reinterpretation—*i.e.*, cases where a plan provision was ambiguous and the plan administrator provided an interpretation of that provision, only to later reinterpret the plan in a way that reduces the employee's accrued benefit. *See Cottillion*, 781 F.3d at 58. Here, however, there is no evidence that the board changed its interpretation or "reinterpreted" the plan in applying § 4.10 to § 9.6(b)(i)(B) or that it has arbitrarily applied § 4.10 to § 9.6(b)(i)(B) in some cases but not in others.

That leaves the second type of case, which involves Treasury Regulation § 1.411(d)–4, promulgated under IRC § 411, a provision identical to the anti-cutback rule contained in ERISA

---

[7] Other circuits, however, have held that the § 204(g)'s anti-cutback rule applies only "to actual amendments of the plan's terms and not interpretations of previous provisions or exercises of discretion reserved by the plan. *See Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 987 (9th Cir. 1997); *Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1451–53 (7th Cir. 1986). But, as noted in the Second Circuit's decision in *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 182–83 (2d Cir. 2013), this definition of "amendment" may be too narrow, especially in light of a particular Treasury Regulation, s*ee Thornton v. Graphic Commc'ns Conference of Int'l Bhd. of Teamsters Supplemental Ret. & Disability Fund*, 566 F.3d 597, 602 n.6 (6th Cir. 2009) (citing 29 C.F.R. § 2530.200a–2); *see also McDaniel*, 203 F.3d at 1114–15 & n.12 (holding that the rules prescribed under IRC § 411 apply with equal force to ERISA § 204).

§ 204(g). S*ee Kirkendall*, 707 F.3d at 183; *McDaniel*, 203 F.3d at 1115, 1118. That regulation

provides:

> A plan that permits the employer, either directly or indirectly, through the exercise of discretion, to deny a participant [an accrued benefit] provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6).

Treas. Reg. § 1.411(d)–4. This regulation seeks to "prohibit[] plan provisions from building

certain broad reservations of discretion into the plan terms." *Kirkendall*, 707 F.3d at 183. The

question, then, is whether the board's exercise of its discretion violates the anti-cutback rule.

Arguably, the board's interpretation is one that denies a participant a benefit, to which,

absent the board's exercise of its discretion under the plan, he would be entitled. *See* Treas. Reg.

§ 1.411(d)–4. But, considering this same issue, the Ninth Circuit held that the legislative history

of IRC § 411(d)(6)—the statutory provision under which Treas. Reg. § 1.411(d)–4 was

promulgated—indicates that neither Congress nor the Treasury Department intended the

regulation to apply to reconciliation of ambiguous plan provisions, and, accordingly, that court

found that merely interpreting ambiguous provisions was not the sort of exercise of discretion to

which Treas. Reg. § 1.411(d)–4 was referring.. *See McDaniel v. Chevron Corp.*, 203 F.3d 1099,

1118 (9th Cir. 2000).

To support this holding, the *McDaniel* court noted that Treas. Reg. § 1.411(d)–4

"appear[ed] to be a direct response to a line of cases that effectively permitted plan

administrators to reduce or eliminate plan participants['] benefits in a manner that did not require

a formal plan amendment," but, importantly, "[n]one of those cases involved an ambiguous plan

provision." *Id*. at 1119 (citing *Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552, 1561

(D.C. Cir. 1984) (refusing to find liability under § 204(g) of ERISA where a plan administrator

changed benefits pursuant to a plan provision rather than an amendment); *Dooley v. Am.*

*Airlines, Inc.*, 797 F.2d 1447, 1451–52 (7th Cir. 1986) (refusing to a find liability under § 204(g) of ERISA where a plan administrator reduced benefits pursuant to a provision authorizing a change in actuarial assumptions "from time to time" rather than pursuant to a technical amendment); *see also Oster v. Barco of Cal. Emps.' Ret. Plan*, 869 F.2d 1215, 1216–17, 1220–21 (9th Cir. 1988) (refusing to find liability where a form of benefits was denied pursuant to a provision that gave the administrator "sole discretion" to make the final determination as to the manner in which benefits are distributed)). Further, the *McDaniel* court noted that ambiguous plan provisions were noticeably absent from Treas. Reg. § 1.411(d)–4's examples of overly discretionary plan provisions.

Considering the complex nature of many pension plans, this one not excepted, and considering the discretion that we grant plan administrators in interpreting the provisions of their plans, it seems reasonable to conclude that "[t]he Treasury Department did not intend to create a system of strict liability for mere ambiguities in the text of a covered plan." *McDaniel*, 203 F.3d at 1119. Instead, the regulation seems targeted at the discretion provisions themselves, and specifically at those provisions that permit case-by-case end runs around the anti-cutback rule. But, because *Firestone* permits broad grants of discretion to plan administrators in interpreting plan provisions, we must allow the board to reasonably resolve ambiguities in the plan—provided they do so consistently and not arbitrarily or capriciously—lest the discretion granted to them under *Firestone* become illusory. In essence, we must draw a distinction between discretion provisions that permit "case-by-case" determinations of benefits and those which merely grant plan administrators discretion in interpreting the plan and its provisions. This latter type of provision is, unequivocally, permitted. *See Firestone*, 489 U.S. at 115. Here, the board did not employ a standalone discretion provision to treat Johnston differently; instead, as noted

before, it used its discretion to reconcile ambiguous plan provisions and Johnston has not demonstrated that the board has deviated from this interpretation. Accordingly, we find that applying § 4.10's prohibition on double counting to § 9.6(b)(1)(B) does not violate the anti-cutback rule.

2.

The second hurdle requires us to consider whether the board acted arbitrarily and capriciously in applying § 4.10 to § 9.6(b)(i)(B). Johnston claims that, while another subsection of § 9.6 expressly refers to § 4.10's non-duplication of benefits, § 9.6(b)(i)(B) contains no such reference. Reading the Plan to include § 4.10's prohibition duplication of benefits in § 9.6(b)(i)(B), Johnston continues, would render the reference to that provision in § 9.6(a)(ii) superfluous. But the omission, at best, creates an ambiguity about whether § 4.10 applies. This is so because § 4.10 unequivocally prevents double counting of years of service. Of course, Johnston is right that § 9.6(b)(i)(B) provides that it applies "[n]otwithstanding any provisions to the contrary." But, just as with § 10.46(c)(i), the language of these provisions is in conflict, rendering ambiguous their application to each other. Further, the board was given discretion to remedy such ambiguities, inconsistencies, and omissions in § 7.1. Reading § 9.6(b)(i)(B) together with § 4.10 to prevent Johnston from receiving double credit for one period of service is rational in light of the plan provisions, is consistent with the board's prior interpretations of these provisions, and is supported by the aforementioned substantial evidence that his pension was part of the DDE asset transfer in July 1997.

Because the board reasonably calculated Johnston's benefit under § 9.6(b)(i)(B) to be less than his § 10.46(c)(i) benefit, the company's actions did not require notice under ERISA. *See* 29 U.S.C. § 1054(h) (providing notice requirements for only significant *reductions* in benefits).

Likewise, amending the plan to include § 10.46(c)(i) did not violate the anti-cutback rule because that provision provided Johnston with an increased benefit, not a significantly reduced one. *See* 29 U.S.C. § 1054(g); *see also Thornton v. Graphic Commc'ns Conference of Int'l Bhd. of Teamsters Supplemental Ret. & Disability Fund*, 566 F.3d 597, 601 (6th Cir. 2009) (noting that the purpose of the anti-cutback rules serves to prohibit pension plan amendments that decrease plan participants' accrued benefits). Therefore, we affirm the district court's determination that the board reasonably determined that § 10.46(c)(i) provided Johnston with his greatest available benefit.

## C.

Johnston also challenges the board's computation of his Average Annual Compensation, or "HC3A" under § 10.46(c)(i). An employee's HC3A for pension-calculation purposes is "an Employee's highest average Annualized Compensation computable for any three consecutive full calendar years." (DE 131-8, A.R. 190, Page ID 12368; DE 131-2, Plan Art. I, Definition of HC3A, Page ID 8025–26.)

For Employees governed by § 10.46, that provision's preamble provides a starting place for determining HC3A:

> Average Annual Compensation [HC3A] for Employees covered under this Section who, since [the end of the DDE joint venture on July 1, 2005], have less than three years of Annualized Compensation at the time of termination and who are vested at the time of termination shall be such Employee's base salary for any Plan Year, determined at the end of such Plan Year, during employment with [Dow] plus the target performance award, if any, for such Plan Year times a factor of .925.

(DE 131-2, Plan § 10.46, Page ID 8186.) "Annualized Compensation" means "the Compensation received by the Employee." (DE 131-2, Art. I, Definition of Annualized Comp., Page ID 8025.) An "Employee" is "any person engaged by [Dow] to perform personal services

in an employer-employee relationship who receives compensation from [Dow] other than a retirement benefit, severance pay, retainer or fee under contract." (DE 131-2, Art. I, Definition of Employee, Page ID 8035–37.) Dow—or "the Company"—is defined as "The Dow Chemical Company and any other entity authorized to participate in the Plan." (DE 131-2, Art. I, Definition of Company, Page ID 8028–29.)

DDE is not the Dow Chemical Company, nor has it ever been authorized to participate in the Plan. Thus, the board reasonably found that Johnston's DDE service could not qualify as Annualized Compensation because it was not compensation earned from the "Company." Nor could his pre-DDE Dow service years qualify; Annualized Compensation requires that the three full calendar years be consecutive. Thus, Johnston's Annualized Compensation will have to come after his transfer back to Dow.

Johnston returned to Dow employment on July 1, 2005 and took early retirement in 2011—giving him more than six years back with Dow. Yet, the board found that he did not have three years or more of Annualized Compensation at the time of termination with the following reasoning. Because of Johnston's length of service, he is entitled to the greater of two benefit formulas: the "grandfathered formula" (also known as the "ERP" formula) or the "current benefit formula" (also known as the "DEPP" formula). The parties agree that the grandfathered formula applies to Johnston because it provides the greater benefit. But calculation inputs under the grandfathered formula were frozen as of December 31, 2005. Accordingly, the board found that Johnston's HC3A should be calculated using the .925 factor because, having returned to Dow on July 1, 2005, and the inputs under the grandfathered formula being frozen as of December 31, 2005, Johnston had three years or less of Annualized Compensation. Simply put, the grandfathered formula's benefit freeze, coupled with § 10.46(c)(i)'s provisions, required

application of the .925 factor. Johnston does not allege that he would have been better off under the current benefit formula.

Johnston's only argument not precluded by the text is that the grandfathered formula freeze should not prohibit the inclusion of his post-2005 Dow service for Annualized Compensation purposes. All Johnston has to say about this, however, is that, "[b]ecause [his] employment terminated on September 30, 2011, more than six years after July 1, 2005, he had more than three years of Annualized Compensation during this period, and the .925 factor does not apply to his calculation under § 10.46." (CA6, R. 19, Appellant Br. at 56.) He does not argue that his post-2005 Dow employment should be used in his HC3A; instead, he argues only that the sole "rational" conclusion is that his grandfathered benefit must be calculated based on his last three years of compensation *before* the freeze. This, of course, requires including DDE compensation, something that is prohibited under the Plan's plain terms. Nor does Johnston explain why the board's decision was arbitrary or capricious or offer what the proper calculation should have been. The board offered a reasoned explanation of its decision to apply the .925 factor in calculating Johnston's § 10.46(c)(i) HC3A and it did so in order to harmonize complicated provisions within the Plan.

### IV.

For the reasons stated above, we affirm the district court's determination that the board did not act arbitrarily or capriciously in denying Johnston's ERISA benefit claims.

SUTTON, Circuit Judge, dissenting. Robert Johnston worked for thirty years at Dow Chemical and at a joint venture between Dow and DuPont (which goes by the name of DDE). His service started with a sixteen-year stint at Dow, led to a nine-year interlude at DDE, and ended with a six-year stint at Dow. That made Johnston eligible for two pensions, one from Dow, one from DDE. Both retirement plans provided for defined-benefit pensions, entitling eligible retirees to a fixed monthly payment premised on the employee's years of service and final average salary. No one had any trouble figuring out how to calculate Johnston's DDE pension, which included his nine years of service with DDE and his initial sixteen years of service with Dow. But they did have a question about how to calculate his Dow pension: Should Johnston's sixteen years of service at Dow before his work at DDE count toward the years-of-service component of his Dow pension? If so, Johnston is entitled to about $5,000 more per year from the Dow pension.

Federal law has a tried and true mechanism for resolving such disputes. Under ERISA, all pension plans must be in writing (to permit employees to prepare for retirement), all plan administrators must adhere to the written terms of the plan (to protect employees' reliance interests), and companies may not lower pension benefits mid-stream (to safeguard both sets of expectations). The written terms of the Dow plan answer today's question as clearly as any pension plan can: Johnston is entitled to count his first sixteen years of Dow service and thus to $5,000 more per year under the Dow pension plan. Because my colleagues permit what ERISA precludes—a reduction in Johnston's pension benefit unauthorized by the plan—I must respectfully dissent.

ERISA requires companies to administer employee benefit plans in accordance with a "written instrument," such as a pension plan. 29 U.S.C. § 1102(a)(1). The terms of a plan may

give the company's plan administrator discretion to resolve ambiguities in the plan. If so, arbitrary-and-capricious review applies to the administrator's resolution of any ambiguities. But that latitude still requires the administrator to base any denial of benefits on a "plausible interpretation" of the plan. *Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 748 (6th Cir. 2014).

This case begins, and largely ends, with § 9.6(b)(1)(B) of Dow's plan. "Notwithstanding any provision of the Plan to the contrary," it says, "Employees who enter the Plan or return to coverage under the Plan from [DDE] shall have their benefits calculated under this clause." A.R. 1881. Under this clause, the administrator calculates benefits by determining the employee's hypothetical full benefit based on his combined service with Dow and an affiliated company (here DDE) as if they had always worked at Dow, then multiplying this number by "a fraction, the numerator of which is the *Credited Service with the Company* [Dow] and the denominator of which is the Credited Service with [Dow] plus the credited service . . . with [DDE]." *Id.* (emphasis added).

In plain, if not everyday, English, § 9.6 tells the administrator to credit Johnston's pre-DDE service with Dow when calculating his benefits. The provision refers to the employee's "Credited Service with the Company [Dow]." Everything hinges on the meaning of that phrase, which permits just one straightforward reading. The definition of "Credited Service" under § 9.6 says to "divid[e] [an] Employee's Hours of Service" by "Location Work Schedule Hours." A.R. 1804. "Employee" in turn is defined as a "person engaged by the Company." *Id.* at 1793. And the "Company" means Dow, not DDE. *Id.* at 1786; *see also supra* at 19. Section 9.6 says nothing about disregarding pre-transfer service with Dow that counts toward the affiliate's pension plan; it refers to all credited service with Dow. Nor is there anything in the plan's

definition of "Credited Service" to that effect. The only permissible reading of "Credited Service with the Company" is that it encompasses all credited service with Dow.

The plan administrators offer no coherent basis for sidestepping this reality. They start by claiming that, when Johnston's old pension assets were transferred to DDE, his sixteen years of service with Dow became "Credited Service" with DDE, not Dow. That would be a plausible way to *write* a plan. But it is not a plausible way to *read this* plan. Neither the plan administrators nor the court points to *any* language in § 9.6 that allows this reading.

The plan administrators and the court cannot overcome this problem by using extrinsic evidence to supply terms for § 9.6 that are not there. *See supra* at 10 ("The board has also produced extrinsic evidence that Johnston was, in fact, part of the July 1, 1997 asset transfer."). ERISA requires the terms of pension plans to be in writing, not in the minds of the company's witnesses who later supply extrinsic evidence after the fact. Otherwise, the reliance interests protected by ERISA's in-writing mandate would be severely undercut. Dow's appeal to extrinsic evidence confirms what the terms of the plan show: Nothing in § 9.6 supports its position.

Section 4.10 does not fill this gap. The district court recognized that "Credited Service with the Company" by its terms includes Johnston's pre-DDE service. And this court, to its credit, acknowledges the same. *See supra* at 12. But both courts claim that § 4.10's alleged prohibition on double counting years of service allowed Dow to alter § 9.6. That approach runs through two red lights.

The first: Section 9.6 begins by prohibiting any such effort: "Notwithstanding any provision of the Plan to the contrary." If § 4.10 is to the contrary, it cannot be used. And if it is not to the contrary, it is irrelevant. The court insists that "these provisions [are] in conflict." *See supra* at 17. But I fail to see how. Section 4 (called Article IV in the plan) does not contain its

23

own "notwithstanding" clause. And nothing in it claims "to supersede any conflicting provision." *See id.* at 9.

The second: Section 4.10 nowhere establishes a general prohibition on double counting that can be used to interpret or for that matter override independent sections of the plan. It merely provides a means of accounting for duplicate pension plans when no more specific provision (such as § 9.6) controls: "If a Participant . . . shall be eligible for a benefit under any [affiliate pension plan] and shall also be eligible for a benefit hereunder based upon the same period of service . . . , then the amount of such other benefit received . . . shall be deducted from the benefit payable hereunder for such same period of service." A.R. 1825–26. We know that § 4.10 does not control this pension calculation because no one—not the plan administrator, not the district court, not this court—uses it in calculating Johnston's pension. No one to this day has used the method for avoiding double-counting that § 4.10 provides. The district court instead used § 4.10 to produce a general principle (to avoid double counting) that it then applied in interpreting the phrase "Credited Service with the Company" (to override § 9.6). That is wishful thinking, not adherence to the written terms of the plan.

For these reasons, it makes no difference whether § 4.10 effects a contemporaneous "amendment" to the plan. *See supra* at 13–17. The question is not whether the anti-cutback provision applies to § 4.10; it is whether § 4.10 applies at all, or for that matter whether the company has used the provision in calculating Johnston's pension. At any rate, neither party makes the argument on which the majority appears to rely.

Reliance on general equitable principles—to the apparent end of preventing Johnston from using his first sixteen years of Dow service to calculate two separate pension payments—do not support Dow's position either. By requiring pension plan administrators to put the terms of

the pension in writing and to honor its language, ERISA prohibits protean methods of pension interpretation.

But I doubt Dow's assessment of the equities anyway. What could be more inequitable to a retiree than changing the terms of a pension plan after he retires? Johnston should have been able to rely on the words of the plan. Plus, Dow had ample reasons, and equitable reasons at that, to write § 9.6 just as it did. It makes considerable sense for a company to promise a generous retirement benefit calculation to induce employees to transfer to a new joint *venture*. It's quite possible that employees like Johnston accepted these new assignments in reliance on that promise given the risk that DDE's pension (but not Dow's) could become underfunded after the venture ended. If the plan administrators and the court think it appropriate to look to extrinsic evidence in this case, they might look to whether Johnston (or others like him) relied on the plan's language in accepting the transfer.

None of the court's other rationales justifies these departures from the text. The court assumes that a later amendment to the plan, § 10.46, "must apply" to Johnston, presumably because of that provision's title: "Transfers from [DDE] Pension and Retirement Plan." *See supra* at 8. It then claims a conflict between § 10.46 and § 9.6 by asserting that "each claims to supersede any conflicting provision." *See id.* at 8–9. But the conflict is a mirage. Because § 9.6 requires the company to credit Johnston's pre-DDE service with Dow, and because everyone agrees that doing so results in a larger benefit under § 9.6 than under § 10.46, *see id.* at 13, §10.46 cannot apply. Invoking a *later* amendment to the plan (§ 10.46) to reduce Johnston's benefit violates ERISA's anti-cutback provision. *See* 29 U.S.C. § 1054(g)(1).

At bottom, Johnston wants to count 22.5 years' service with Dow in the numerator ("Credited Service with the Company") and 22.5 years' service with Dow plus 9.3 years' service

with DDE in the denominator ("Credited Service with the Company plus the credited service with [DDE]"), for a fraction of 22.5/31.8. That's a straightforward application of § 9.6. Through three stages of review, no one has put forward a plausible interpretation of § 9.6 that supports Dow's position. No one has put forward a plausible interpretation of § 4.10 that supports Dow and that Dow has used to calculate Johnston's pension. And no one has put forward a plausible interpretation of § 10.46 that supports Dow and does not violate ERISA's anti-cutback provision. Implausible interpretations of pension plans necessarily are arbitrary and capricious interpretations of pension plans. Johnston deserves the extra pension benefit, just as the plan requires. I would reverse.